Bowman Dairy Company for use of Phoenix Insurance Company of Hartford, Connecticut, Appellee, v. Charles P. Megan, Appellant.

Gen. No. 39,840.

Opinion filed June 21, 1938.

Nelson J. Wilcox, Nelson Trottman and I. C. Belden, all of Chicago, for appellant; William T. Faricy, of Chicago, of counsel.

Heth, Lister & Flynn, of Chicago, for appellee.

Mr. Presiding Justice Friend delivered the opinion of the court.

On the afternoon of October 1, 1935, four cars of milk, being transported in interstate commerce by the Chicago and North Western Railway to Chicago, were destroyed at Genoa City, Wisconsin, by a group of farmers who were conducting a so-called "milk strike." The Phoenix Insurance Company of Hartford, Connecticut, had issued a policy covering these shipments and paid the Bowman Dairy Company, nominal plaintiff herein, the sum of $3,593.84 on account of the loss incurred. The insurance company, claiming subrogation to the rights of the Bowman Dairy Company, brought suit for its claim against Charles P. Megan, who had been appointed trustee of

the property of the railroad company by the United States court, pursuant to a reorganization proceeding under sec. 77 of the Federal Bankruptcy Act. Megan, as trustee, filed an answer in which he admits the delivery of the shipment to him for transportation to Chicago, pleads a contract provision exempting the railroad company from liability for loss, damage or delay resulting from riots or strikes, and avers that the reason for such nondelivery was that the cars containing milk were, while at Genoa City, Wisconsin, and in transportation in interstate commerce, violently and forcibly destroyed by a group of rioters who were conducting a ''milk strike'' and who, without warning to defendant, overpowered its crew, seized the cars and destroyed the contents thereof, without negligence on the part of defendant. For a second defense Megan's answer pleads a contract provision under which defendant claims to be entitled to the full benefit of any insurance effected on the property, so far as this should not avoid the policy of insurance, avers that the policy contained no clause under which the contract of insurance would be voided by the contract provision giving defendant the full benefit of any insurance effected upon the property transported, and therefore denies that the insurance company was the owner of the claim and asserts that by reason of the fact that insurance was effected upon the property and full reimbursement made by the insurer the defendant was not liable for the loss, whether or not he otherwise would have been liable. Plaintiff filed a reply setting forth in detail certain facts alleged to constitute negligence on the part of the defendant, and also asserting the invalidity of the contract provision with respect to defendant having the benefit of the insurance. The cause was tried by the court without a jury, resulting in findings and judgment for plaintiff. Megan, as trustee, has prosecuted this appeal.

It appears from the evidence that two of the milk cars originated at Harvard, Illinois, one at Capron, Illinois, and one at Poplar Grove, Illinois. Poplar Grove and Capron are stations west of Harvard on a branch line of the Chicago and North Western Railway. Between Harvard and Chicago the railroad company has one line wholly within the State of Illinois and another line, over which these cars were routed, running in an easterly direction from Harvard across the Wisconsin State line toward Kenosha, where it joins with a north and south line into Chicago. It was stipulated that for good and sufficient operating reasons the railroad routed these shipments over into Wisconsin instead of entirely within the State of Illinois, and that in so doing it was not in any manner seeking to bring itself under the Federal law instead of the law of Illinois.

The shipments from Poplar Grove and Harvard were made under what is known as the "milk and cream way bill," a document issued in the case of milk shipments under a special tariff of the Chicago & North Western Railway governing milk and cream shipments into Chicago. This waybill performs the functions of the ordinary bill of lading, and the tariff under which it is issued specifically provides that traffic handled under it will be subject to the terms and conditions of the uniform bill of lading as published in the classifications. Among the contract terms and conditions of the uniform bill of lading is a provision that no carrier shall be liable for loss, damage or delay "caused by the act of God, the public enemy, the authority of law, or the act or default of the shipper or owner, or for natural shrinkage," and that "except in case of negligence of the carrier or party in possession, the carrier or party in possession shall not be liable for loss, damage or delay . . . resulting from . . . riots or strikes." Under the provisions of the

bill of lading the burden of proving freedom from negligence is cast upon the carrier or party in possession.

After picking up the milk cars, the train, consisting of a locomotive and tender, four milk cars, one empty car, and a baggage combination car and a coach, left Harvard at 3:20 p. m., passed through Hebron, a station about eleven miles east of Harvard and arrived at Genoa City, Wisconsin, at 4:26 p. m. It stopped at the outskirts of Genoa City, near a switch from which there is a track leading to the Borden-Wieland, Inc., plant at that place. The reason for stopping at that point was to enable the engine to uncouple, proceed to the Borden-Wieland plant and pick up a car of milk there. When the train came to a stop, the cars involved in this case were standing on the bridge over Nippersink Creek. While the train was thus standing on the track, with the engine cut off, a mob, consisting largely of young men, swarmed, without warning, out from under the bridge, up the embankment, seized the cars, broke the seals and dumped the milk.

The record discloses that Bowman Dairy Company had consistently refused to patronize the railroad for more than a year, and had regularly transported milk by its own trucks to Chicago. When it became aware of dissatisfaction among producers in its territory, culminating in a strike on October 1, its executives, apprehending possible trouble to its trucks on the highway, on September 30, 1935, took out the policy of insurance against riot, upon which the insurer now relies for subrogation, and directed that shipments be made by rail, because they "didn't want to take any chances" in getting their trucks through on the highway. It is evident that the Bowman Dairy Company took out this insurance because it anticipated some risk in making shipments, and although it could have fastened upon the railroad company the more strin-

gent liability imposed upon carriers at common law in the absence of contract, by payment of a 10 per cent higher rate of insurance provided for in the classification, it elected to ship at the lower of the two optional rates, so that the carrier would be liable only if negligent in fact.

As affecting these questions, a summary of the facts preceding October 1, 1935, discloses that the "Chicago Milk Shed," from which this city obtains its supply of milk, embraces large portions of Indiana, Illinois and Wisconsin. The milk was supplied by some 26,000 farmers, of whom about 16,000 were members of the Pure Milk Association, which had contracted to sell the milk of these farmers to the milk companies at a stipulated price and for a specified time. The association had made an agreement with the milk companies, effective September 1, 1935, to lower the price of milk 20 per cent. Thereafter meetings were held at Hartford, Capron, Poplar Grove, Hebron, Genoa City and other towns in the district, by farmers who were dissatisfied with this reduced price, and rumors were spread that a milk strike was impending. Handbills were distributed at various places, and notices were posted that there was to be a meeting of milk farmers at Elgin, Illinois, on Sunday, September 29, 1935. This meeting was attended by about 500 farmers and a strike was voted for the following Tuesday, October 1. Write-ups concerning this meeting and the calling of the strike appeared in various newspapers published in Elgin, Kenosha, Chicago and other cities on Monday, September 30, 1935, and were offered in evidence by plaintiff. However, express disclaimers of violence by the strike leaders were recited in these newspaper accounts, and two of the strike leaders, Fred R. Wolff and Henry Dunker, testifying as defendant's witnesses with respect to what occurred at the Elgin

meeting, both disclaimed any intention on the part of the strikers to commit acts of violence.

There is considerable evidence that on the morning after the strike had been called, a group of farmers gathered at the various places from which the milk had been shipped, threatening farmers who were bringing in their supplies for shipment, picketing the Bowman plants, stopping milk trucks and otherwise evincing acts of hostility, of which the various railroad agents were aware, and these facts are emphasized to support the contention that defendant had notice of the strike, that he was bound under the law to anticipate the nature of the violence that ensued, and that he took no precaution to guard against such violence; and it is argued that these circumstances indicate such negligence on the part of defendant as to render him liable under the uniform bill of lading.

Under plaintiff's theory of the case it becomes pertinent to inquire whether defendant, by reason of the newspaper articles, rumors of dissatisfaction, and the situation as it existed on the morning of October 1, 1935, was apprised of any threats of violence and whether he, through his agents, should either have refused to accept the shipments in question or have taken some action to safeguard the shipments, notwithstanding the disclaimers of violence in the newspaper accounts and by the strike leaders.

Defendant's counsel say that they have been unable to find any decision involving a common carrier in which under a similar state of facts this question has been directly passed upon, but that *Portage Co-op. Creamery Ass'n v. Sauk County,* 216 Wis. 501, which arose under a Wisconsin statute, and where the county instead of the carrier was defending, presents a situation which is indistinguishable from the case at bar, and presents authority for the defense here inter-

posed. In that case the Portage Co-operative Creamery Association, plaintiff, brought an action under the statute to recover for the destruction of a quantity of cream by a mob of farm strikers on a public highway in Sauk county. The statute makes cities and counties liable for mob or riot damage, *subject to the limitation that no one might recover unless he shall have used all reasonable diligence to prevent the damage, and shall have immediately notified the mayor or sheriff*, "after being apprised of any threat of, or attempt at, such injury." The damages in that case occurred November 10, 1933. Plaintiff knew that during the month of November farm strikes were being held throughout the State, and on November 7 a group of approximately fifty men appeared at plaintiff's place of business, and through their spokesman made certain demands upon one Doyle, plaintiff's manager. No threats were made to Doyle, and he was not told to discontinue his collections of milk and cream in that county, but while the conference was in progress, one Jensen, evidently one of the strikers, remarked to one Rasmussen, a driver of one of plaintiff's trucks which collected cream in Sauk county, "if you don't stay out of Sauk County it will be just too bad." Although the delegation of strikers interviewing Doyle made no threat to him, they did request that plaintiff cease soliciting certain designated patrons, that plaintiff close its plant, with the exception of the bottled milk department, that a stipulated amount be paid for milk, and that plaintiff pay the strike fund a designated amount. All of these demands were disregarded, and without actual knowledge of the threats made to Rasmussen, plaintiff continued to operate trucks throughout Sauk county up to November 10. On that day a group of some twenty-five men approached Rasmussen's truck on the highway, and dumped the cream. An action was brought

to recover for this loss. Sauk county relied for its defense upon the statement by Jensen to Rasmussen, thereby contending that plaintiff had by this remark been apprised of the threat to its property, and that its failure to notify the sheriff of this threat constituted a defense. The Supreme Court of Wisconsin discussed at length the controlling question, whether the statement by Jensen to Rasmussen constituted a threat to injure plaintiff's property, and whether plaintiff had knowledge of that threat by reason of the fact that it was made to Rasmussen, one of plaintiff's employees, who was a driver of a truck upon one of plaintiff's routes in Sauk county, and held that the employer is not chargeable with knowledge of the substance of every conversation that may occur between his employees and another; that in order for one to be regarded as an agent he must know that he is an agent and is being treated as such, and not as an individual; and that there must be circumstances which would, under reasonable calculations, cause the one so addressed to realize that he was an agent and was being told that as such. Under the circumstances in that case, the court held that the conversation of Jensen and Rasmussen did not constitute a notice of threat to the plaintiff of interference with its business by a mob, pointing out that the assembly which waited on Doyle was orderly, and that no evidence appeared which warranted styling it a mob; and that the lower court's finding of fact that Jensen was the spokesman of the delegation of November 7 was clearly against the manifest weight of the evidence, and could not be sustained. On the question of negligence, the court held that the evidence failed to disclose any failure or neglect on plaintiff's part, and that the judgment should have been in favor of plaintiff.

In deciding the *Portage Co-op. Creamery Ass'n* case, the Wisconsin court relied upon and followed *Long v. City of Neenah,* 128 Wis. 40, an earlier case arising under the same statute. An action was there brought to recover damages for personal injuries sustained by plaintiff while a resident of the city of Neenah, Wisconsin. As an employee of Kimberly & Clark Company, he was assaulted by a riotous mob on July 5, 1904. Plaintiff had gone to work for that company on June 13, and was then told by his employer that there was likely to be a walkout in the plant. The employees, including plaintiff, were all nonunion men, and took their meals at a hotel in the city during the progress of the strike, which occurred in the period between June 13 to the date of the assault. During this period there were always groups on the streets, made up of union men and their sympathizers, who would jeer the men going to work in the Kimberly plant, call them vile names, and threaten them with violence. On one occasion two of the employees were knocked down and plaintiff evidently considered himself in danger. From June 20 to July 2, plaintiff and other nonunion men took their meals in the mill, and on Saturday evening, July 2, plaintiff went to Chicago and returned to Neenah shortly after three o'clock in the morning of Tuesday, July 5, when he was met at the depot by a riotous mob, and assaulted. He brought suit against the city under the riot statute, and the principal defense interposed was that plaintiff ''after being apprised of any threat or attempt to do harm or injury to his person by any such mob or riot,'' did not ''immediately notify the mayor of the city.'' The question in that case likewise turned upon whether plaintiff was barred from a recovery because of his failure to notify the authorities, as contemplated by the statute. The Supreme Court of Wisconsin, after

citing numerous New York decisions, held that plaintiff was only required to notify the mayor of any threat of the mob to do him injury, "after being apprised of the same"; that the requirement of notice necessarily contemplated that a sufficient period of time would intervene between the threat and the execution of it to admit of notice being given; and the court held that it found no evidence in the record that before going to Chicago plaintiff had been apprised of any danger to his person by the mob who met him at the depot upon his return from Chicago. It was also contended by defendant that plaintiff was negligent in leaving the mill alone, and going to and from the depot unguarded, but the court held against this contention, saying that it failed to find any evidence tending to prove that the injury was caused by plaintiff's negligence.

One of the cases cited in *Long v. City of Neenah* is *Loomis v. Board of Supervisors of Oneida County,* 6 Lansing 269, a decision of a New York lower court in 1872. Action was there brought against the city to recover for damage to property destroyed by a mob. Plaintiffs, with others, owned the property destroyed, as tenants in common. Some of them, several days before the assembling of the mob, had been notified and apprised of threats and attempts made to destroy the property; but other plaintiffs had received no actual notice and had no personal knowledge of the threatened or intended destruction of the property. The defense interposed was that the notice required by the statute to be given the sheriff or the county had not been given. The court charged the jury that such of the plaintiffs as had been thus notified were not entitled to recover, because they had failed to notify the sheriff of the county regarding the threats, but that such of them as had not been notified, and had no per-

sonal knowledge of the threats, were entitled to recover, and that notice to their coplaintiffs and tenants was not, in law, a notice to them.

Although the question of a statute similar to the ones invoked in these various decisions is not involved in the case at bar, the logic and conclusions of the Wisconsin court are, in our opinion, clearly applicable to the situation presented here, and upon the record we think there was no occasion for defendant to apprehend any attack on the trains operated by him as trustee, by reason of the existence of a strike. The officers of the Bowman Dairy Company evidently had no serious apprehension of trouble in the case of shipments by rail, and there is no convincing evidence from which the court was justified in finding that the carrier should have anticipated mob violence. Although it is true that there were rumors of an impending strike, and that the railroad through its agents must have known by reason of the newspaper articles published in various cities and towns, that the milk farmers had attended a meeting at Elgin and voted to strike, and that groups of farmers had congregated at various places from which the milk was being shipped, evincing acts of hostility, no notice of threatened actual violence was given or brought home to defendant. Although, unfortunately, violence occasionally accompanies industrial and economic disputes, most labor controversies are carried on without violence or disorder, and the mere voting of a strike does not necessarily imply that violence will follow. In this case the disclaimers of violence by strike leaders, through the newspapers, would have justified the carrier in accepting those assurances at their face value. It is a familiar principle in equity that mere apprehension of danger, in the absence of something more tangible, such as actual threats, does not entitle

a litigant to equitable relief, and the philosophy of anti-injunction legislation is largely based upon this principle.

The cases cited by the respective parties, allowing recovery against carriers for riot damage, in the main involved affirmative negligence after direct threats or actual knowledge of violence had been received by the carrier, and there are apparently few cases in the books which deal with damage to property in transit by mobs. Some of these cases are collected in a note in 20 A. L. R. 262. Where liability was fixed upon the carrier, however, the courts have invariably found evidence that there was ample time between actual threats of violence and the knowledge thereof, on the part of the carrier, to protect the shipment, and in such cases the courts have said that common prudence would have suggested the propriety of keeping a lookout where a mob, bent on destruction, was operating in close proximity. The evidence in the case at bar presents no situation of this kind, and the undisputed facts disclose that nothing occurred, up to the time that these milk cars were delivered to the carrier, which would reasonably lead one to suppose that the train transporting them would be attacked and the contents of the cars destroyed.

Various other questions are raised and argued, including the contentions that under the provisions of the bill of lading the defendant is entitled to the benefit of the insurance, as set forth in defendant's answer, and as to the admissibility of various items of evidence, but in view of our conclusion on the main point involved, we deem it unnecessary to further prolong this opinion by discussing them. After a careful examination of the record we are of the opinion that the court should have found the issues in favor of defendant, and since the case was tried before the court

without a jury, upon a voluminous record, it would serve no useful purpose to remand it for retrial. Therefore, the judgment of the superior court is reversed.

*Reversed.*

SCANLAN and JOHN J. SULLIVAN, JJ., concur.