S. A. Rose, Appellee, v. City of Chicago et al., Defendants, Yellow Cab Company, Appellant.

Gen. No. 41,753.

Opinion filed November 17, 1942.   Additional opinion filed and rehearing denied January 7, 1943.

JOHN A. BLOOMINGSTON, SAMUEL A. & LEONARD B. ETTELSON, all of Chicago, for appellant; EDWARD C. HIGGINS, FRED W. POTTER, JR. and ROBERT E. SAMUELS, all of Chicago, of counsel.

LEDERER, LIVINGSTON, KAHN & ADSIT, of Chicago, for appellee; HARRY H. KAHN, of Chicago, of counsel.

MR. JUSTICE SCANLAN delivered the opinion of the court.

A personal injury case in which plaintiff sued City of Chicago, Yellow Cab Company, Barney Galecki and Ben Kaplan. Plaintiff dismissed the cause as to Galecki and Kaplan. A jury returned a verdict finding the City of Chicago not guilty and Yellow Cab Company guilty and assessing plaintiff's damages at $5,500. The Yellow Cab Company, hereinafter called defendant, appeals from a judgment entered upon the verdict.

The first count of the complaint, as amended, alleges:

"1. That plaintiff is a resident of the City of Joplin, . . . Missouri, and that the defendant, City of Chicago, is a municipal Corporation . . . ; the defendant, Yellow Cab Company, is a corporation. . . .

"2. [Refers to the duties of the City of Chicago.]

"3. That on . . . March 17, 1937, the plaintiff . . . was a passenger in a cab which was owned by the defendant, Yellow Cab Company, a corporation, and that said plaintiff was at all times in the exercise of due care and caution for his own safety."

The balance of this count refers to charges against the City of Chicago.

The second count contains paragraph 1 of the first count, and paragraph 5, which refers to expenses incurred, and in addition alleges that on March 17, 1937, defendant was the owner and in possession and control of the taxicab, which was being operated by its agent; that on said date plaintiff was a passenger for hire in said taxicab and was at all times in the exercise of due care and caution for his own safety; that it was the duty of defendant to protect plaintiff as its passenger from insults, assaults and humiliations by outsiders and by its own servants and em-

ployees, and that it failed in that regard in the following particulars:

"(a) Permitted said taxicab containing plaintiff to be driven into the hands of a riotous mob.

"(b) Held itself out as being able to carry passengers with safety notwithstanding the existence of a threat strike and its accompanying violence of which defendant had knowledge.

"(c) Impliedly warranted its ability to carry passengers with safety, and allowed plaintiff to be driven into the hands of a riotous mob.

"(d) With knowledge that there was a strike and that during the strike other cabs had been tipped over permitted plaintiff to be driven into danger zone.

"(e) Failed to warn plaintiff that it could not safely carry passengers in its taxicab and permitted plaintiff to be driven into the hands of a riotous mob.

"(f) Allowed plaintiff to be attacked and injured by its own servants and employees, whereby plaintiff was beaten and injured."

Plaintiff asks judgment against defendant for $100,000.

The third and fourth counts refer to defendants Galecki and Kaplan.

The answer of defendant states, *inter alia*:

"(a) That the plaintiff should not recover from this defendant, for the reason that if the said plaintiff was suddenly set upon and attacked by rioters, mobsters and others, as averred and set forth in the said complaint, that the plaintiff's cause of action, if any, is against the defendant, the City of Chicago, and the defendant, Ben Kaplan, and other members of the said mob and other rioters, and not against this defendant.

"(b) That the plaintiff knew, or by the exercise of any diligence whatsoever should have known, that a taxicab strike was in progress at the time of and prior

to the time that he entered the said taxicab, that he knew, or by the exercise of any diligence whatsoever, could have known or ascertained that rioters, mobsters and strikers might or would attack the said taxicab and that if he undertook to ride in the said taxicab, that he might sustain injuries, that if he did sustain injuries, as is averred and set forth in the said complaint, that they were proximately caused and brought about by and through his own carelessness and negligence, and were not proximately caused or brought about by or through any carelessness or negligence on behalf of this defendant, or any of its agents or servants.

"(c) That if the plaintiff sustained any injuries or damages, as is averred and set forth in the said complaint, and each and every count and paragraph thereof, that this defendant would not be liable therefor, because this defendant says that if the plaintiff was attacked by a mob and was beaten or injured, as is therein averred, that this defendant had no notice or knowledge that a mob might or would be at the particular place where the plaintiff was attacked and injured (if he was attacked or injured), and that the said mob was formed without any knowledge or notice to this defendant, or any of its agents or servants, and that the said attack by the mob, if any, was sudden and unforewarned and could not have been prevented by this defendant under the circumstances of the said attack, if any."

Plaintiff thereafter filed an additional count which alleges, *inter alia*, the following:

"3. That on . . . March 17, 1937, the defendant, Yellow Cab Company, a corporation, was engaged in the business of operating taxicabs for hire to the general public in the City of Chicago.

"4. That on . . . said date aforesaid, the plaintiff, while in the City of Chicago aforesaid, was solicited by the defendant, Yellow Cab Company, a corporation, to become a passenger for hire in one of its

said taxicabs and then and there impliedly warranted its ability to carry the plaintiff safely to his destination in said City of Chicago, and the plaintiff, accepting said invitation, and relying upon said implied warranty, became a passenger for hire in said taxicab.

"5. That it then and there became and was the duty of said defendant, Yellow Cab Company, to use the highest degree of care and caution in the operation and control of its said taxicab while the plaintiff was its passenger, as aforesaid, but that the said defendant, Yellow Cab Company, not regarding its duty in that behalf, by and through its agents, servants and employees, carelessly and negligently:

"(a) With knowledge of the existence of a taxicab strike and its accompanying violence, drove said taxicab containing plaintiff, as aforesaid, into the hands of a riotous mob.

"(b) With knowledge of the existence of a taxicab strike and its accompanying violence and with knowledge of the fact that during said strike, other taxicabs had been attacked and tipped over by mobs and the occupants thereof injured, drove said taxicab containing the plaintiff, as aforesaid, into a zone of danger.

"(c) With knowledge of the existence of a taxicab strike and its accompanying violence and with knowledge of the fact that during said strike other cabs had been tipped over and occupants thereof injured, solicited, invited, allowed and permitted plaintiff to enter into and become a passenger for hire in one of its said taxicabs and while the plaintiff was in said taxicab, as aforesaid drove, caused and permitted said taxicab to be driven into a zone of danger into the hands of a riotous mob without warning the plaintiff of the fact that it could not safely carry passengers in its taxicabs and without warning the plaintiff of such danger.

"(d) While the plaintiff was a passenger for hire in said taxicab aforesaid, the defendant, Yellow Cab Company, with full knowledge of the facts and circum-

stances aforesaid, drove and caused the plaintiff to be driven into a zone of danger and into the hands of a riotous mob and caused and permitted the taxicab in which the plaintiff was then riding, as aforesaid, to be attacked by a riotous mob.

"(e) That by reason thereof, the plaintiff was then and there violently attacked and severely beaten by said mob and then and there became and was injured externally and internally and various bones of his body were broken and he suffered a severe shock to his nervous system and bruises, contusions, and lacerations about his body, and became and was sick and disabled and confined to his bed for a long period of time and was compelled to and did have medical and surgical care and attention and he will permanently suffer pain and discomfort and will permanently be disabled and suffer physical impairment as a result thereof.

"Wherefore, plaintiff asks judgment against the defendant, Yellow Cab Company, a corporation for $100,000."

Defendant's answer to the additional count states, *inter alia*:

"3. This defendant answering paragraph three says that it was engaged in the business of carrying passengers in the City of Chicago, but denies each and all of the remaining allegations contained in the said paragraph three.

"4. This defendant answering paragraph four says that the plaintiff was a passenger in one of its taxicabs at the time and place mentioned, but denies each and all of the remaining allegations contained in the said paragraph, and, in particular, denies that the plaintiff was solicited by the defendant, or that this defendant or any of its agents and servants impliedly warranted its ability to carry the plaintiff safely, or that the plaintiff accepting the said invitation relied upon any warranty from this defendant, or

any of its agents, in becoming a passenger of this defendant in the said taxicab, and this defendant answering further denies that there was any implied warranty of any kind, as is averred and set forth in the said paragraph, or that such warranty is as a matter of law implied, as is averred and set forth therein, and this defendant answering denies that there is an implied warranty as a matter of law.

"5. This defendant answering paragraph five denies the allegations therein contained, together with each and every allegation contained in sub-paragraphs (a) to (e), both inclusive, and, in particular, denies that there were any duties upon this defendant, or any of its agents or servants, as is specified in the said paragraph and sub-paragraphs (a) to (e), both inclusive, or that this defendant or any of its agents or servants were careless and negligent in any of the particulars specified in the said paragraph and the said sub-paragraph (a) to (e), both inclusive, and, in particular, denies that the plaintiff sustained any injuries or damages, as is more particularly averred and set forth in the said sub-paragraphs, or that by reason of anything averred in the said additional count, and each and every paragraph thereof, the said plaintiff herein is entitled to recover a judgment against this defendant in the sum of $100,000, or any other sum whatsoever.

"This defendant as a further answer and defense to said additional count, and each and every paragraph thereof, adopts as its answer thereto the further and additional defenses set forth in sub-paragraph (a), (b) and (c) of its answer to the original complaint of the plaintiff."

Plaintiff's theory is "that he was a stranger in Chicago without any knowledge whatsoever of the existence of the cab strike or of the danger in connection therewith; he was accepted as a passenger by the defendant who, by reason of its knowledge of numer-

ous acts of violence to its cabs and drivers, knew, or should have known that a dangerous situation existed and that it could not undertake to safely carry the plaintiff, and that without in any manner whatsoever warning the plaintiff, it did undertake to carry him as a passenger, and deliberately with full knowledge of all the dangers, drove the plaintiff into the hands of the striking mobsters, and that as a consequence of the defendant's negligence in this regard, the plaintiff was severely injured.''

Defendant's theory is that ''the court should have directed a verdict for the defendant, Yellow Cab Company; said company was not guilty of any negligence and none was proved at the trial; there was no obligation to warn [plaintiff]—because there was no known imminent danger; there was no negligence on the part of the defendant; the negligence if any was that of mob; *negligence of a third party does not render the carrier negligent unless the carrier could reasonably have anticipated and guarded against the injury.''* (Italics ours.)

A strike of defendant's taxicab drivers commenced on the morning of March 5 and continued until March 28. Plaintiff, a resident of Joplin, Missouri, and a business man engaged in the machinery and metal business on a large scale, arrived in Chicago on March 16, 1937, to attend a convention of the Metal Institute at the Sherman hotel. He testified that he was not aware of the existence of the cab drivers' strike; that when he arrived in Chicago on the morning of March 16, he proceeded by cab to the Sherman hotel, where he registered, and spent that entire day and evening in the hotel attending to his business; that he took all of his meals in his room; that on the 17th he did not leave the hotel until about two o'clock p.m., when he entered a cab in front of the hotel and went to the Merchandise Mart; that his business at that place took about ten minutes and that he then

left the Mart and saw a Yellow cab standing at the curb; that he had no conversation with the driver save that as he entered the cab he directed the driver to take him to 20 Wacker Drive; that he was the only passenger in the cab; that he sat in the rear seat of the cab, which proceeded south on Wacker Drive; that as the cab approached Randolph street and was about midway in the block he saw a crowd of some two hundred men coming east across the Randolph street bridge and turning north on Wacker Drive; that the crowd ran toward the cab in which he was riding and surrounded it; that the cab driver attempted to back away from the mob but was unable to do so; that as the mob approached the cab they were throwing rocks and bricks at it; that rocks and bricks were thrown into the cab; that plaintiff lay down on the floor of the cab; that a dozen or more members of the mob came around to the right side of the cab and one fellow said to plaintiff, "Get out," and as plaintiff started to get out he was hit on the head with something; that they opened the rear door, grabbed hold of him, dragged him out of the cab, "and beat him up"; that he was hit on the head over the right eye with a galvanized pipe two inches in diameter and fifteen to eighteen inches long; that he was thrown down on the pavement, stepped upon and kicked; that the cab was tipped over on its side; that a lighted match was applied to the gas tank; that a fire blazed up but was put out before it burned the cab; that he became unconscious and the next thing he remembered he was sitting on the curb. The character of the mob and the nature of their assault is described as follows in defendant's brief: "This driver or ten drivers could not have prevented the mob from doing as they pleased. The driver himself was badly beaten and injured. He was rescued by a police officer with a drawn gun."

Defendant contends that the court erred in not directing the jury to find defendant not guilty as there

was no evidence to prove that defendant was guilty of any negligence.

" 'A motion to instruct the jury to find for the defendant is in the nature of a demurrer to the evidence, and the rule is that the evidence so demurred to, in its aspect most favorable to the plaintiff, together with all reasonable inferences arising therefrom, must be taken most strongly in favor of the plaintiff. The evidence is not weighed, and all contradictory evidence or explanatory circumstances must be rejected. The question presented on such motion is whether there is any evidence fairly tending to prove the plaintiff's declaration. In reviewing the action of the court of which complaint is made we do not weigh the evidence,—we can look only at that which is favorable to appellant. *Yess v. Yess*, 255 Ill. 414; *McCune v. Reynolds*, 288 id. 188; *Lloyd v. Rush*, 273 id. 489.' (*Hunter v. Troup*, 315 Ill. 293, 296-7.)" (*Mahan v. Richardson*, 284 Ill. App. 493, 495. See, also, *Thomason v. Chicago Motor Coach Co.*, 292 Ill. App. 104, 110; *Wolever v. Curtiss Candy Co.*, 293 Ill. App. 586, 597.)

Defendant's argument as to the facts does not always observe the principles of law that govern us in passing upon the contention. Defendant states that the evidence shows that while there had been occasional acts of violence, the business of defendant went on as usual; that "on the day in question the police department and other law enforcement agencies were functioning and there were, so far as the record shows, only a few sporadic acts of violence previously committed, which were immediately taken care of by the police and no record of any passenger or driver injured by strikers"; that "no proof was made that the alleged miscreant or miscreants that hit him with the pipe, or whatever it was, were employees of the Yellow Cab Company. . . . This incident happened on a street adjacent to the loop, in broad daylight in

the City of Chicago. The City . . . has a police force which is presumed to be adequate to protect its citizens who use the streets. The Yellow Cab Company had a right to assume that they and their passengers would receive the protection necessary to permit them to operate their cabs on the streets. So far as the records shows, the forces designed by the City to enforce law and order had not broken down. A taxicab driven on Wacker Drive suddenly encounters a crowd of men who are crossing the Randolph Street bridge. The crowd appears threatening and the driver seeks to escape them and does what any prudent man would do under like circumstances. Neither the company nor its driver knows of the mob or its location and apparently it had suddenly gathered and without violence, else the police force would have been called to quell any disturbance.'' Defendant argues: ''Granted that the plaintiff was a stranger in Chicago; granted that he knew nothing about the strike (this is of course untrue but we will assume it. A man could not be in Chicago for two days without knowing about it unless he was deaf, dumb and blind); granted that he was a passenger; granted that the defendant knew of numerous acts of violence, what does this prove that would make the defendant liable? What does the plaintiff say? The plaintiff says that the defendant knew 'that it could not undertake to safely carry the plaintiff.' There was of course not a scintilla of proof that supports this claim. No passenger had been threatened or attacked so far as the record shows. In substance then, the charge is that, because the employees of the Yellow Cab Company were on strike, that is, 2,000 of them out of a total of 2600, that because there had been damage to cabs that the defendant was negligent in carrying on its business and carrying passengers. The plaintiff says that they knew they could not undertake to safely carry the plaintiff. Well, what then? They should shut down

their business, and that their failure to shut down their business was negligence."

Following the principles of law that must guide us in passing upon the instant contention we will refer to certain evidence that tends to support plaintiff's action. We have heretofore stated certain parts of the testimony of plaintiff.

Thomas Hogan, president and general manager of the defendant Company, was called by plaintiff as a witness, "as if under cross-examination." He testified (by deposition) that there was a strike of its cab drivers that started the morning of March 5 and continued until March 28; that the Company employed about 2,600 cab drivers; that 2,000 of the drivers struck and about 600 continued to drive cabs; that the strike was not confined to any particular part of Chicago; that "there was reported violence"; that on March 6 he issued orders to place more than one man on the cabs; "the order was to place in the rear of the cab. There was none up in the driver's seat. Had two men in a car, and sometimes three men in a car"; "but only one in the driver's seat"; that he issued the said orders to all the garage managers; that some of the men that he ordered to ride in the cabs were regular employees of the Company, but that he hired some men for the special purpose; that off and on during the strike the handles of the cabs were missing from the doors of the cabs; that the drivers removed the handles of their own accord; that "when we started to operate on the morning of the 6th, the drivers—we were getting the cabs out—the drivers were fearful of standing on a stand like the Congress or Sherman all alone. So, I said, 'Put a car down on the corner with two or three fellows to stand in there, stand right on the corner, and if there are one or two cars there, then they will pull in there' "; that this applied only to the head cab, "either the head cab or the tail cab in line. . . . Q. By the Sherman and

Congress, you mean the Sherman Hotel—A. Any of those big hotels. That applied to all of them. You see, a driver did not want to be the only cab there, but if there was a couple of cars there—they called them decoys. Q. Decoys? A. Yes. Q. You mean the men that were in the cabs? A. No, the cabs was called decoy cabs. Q. So that the public might see somebody in the cabs? A. No. Q. What do you mean? A. No, it was all for the drivers. . . . Q. Just to give the driver confidence? A. That is it. Q. Do you know whether any of the drivers of your cabs were attacked by any mobs on or about the 17th of March, 1937? A. I heard of them, yes''; *that during the entire strike the cabs were ordered to solicit fares in Chicago; that he never issued any orders to the drivers to make any statement about the strike to prospective fares during the strike*; that about March 6 or 7 he called up the sergeant of police at 11th and State streets; that the strike was on for a few days ''before there was any report of any trouble whatsoever. . . . Then there was very few. Q. Well, did you know that any cabs had been tipped over on LaSalle Street, near Randolph? A. I had had reports on some that was reported at Clark and Randolph, but I did not have any that was reported on LaSalle and Randolph, or any other street. There was one over on the West Side stolen, and taken in an alley, and then there was two at, I think there was two at Clark and Randolph, as I remember it. Q. That is near the Sherman Hotel? A. Yes, Clark and Randolph''; that ''a bunch come up there one morning and walked around in a ring'' in front of the office of the defendant; that the first knowledge he had of any attack on cabs was on March 7th or 8th; ''Q. Did it continue through the 17th of March? A. Yes, it continued through the 17th of March''; that on the morning of March 5, when he got back, ''we had all kinds of violence; . . . prior to the

17th of March there was much violence to taxicabs. Q. In the loop? A. Reported violence, yes''; that he did not investigate newspaper accounts of violence to cabs in the loop because he felt that if there was anything going on in the loop the police were able to take care of it.

·Benjamin Samuels, vice president of defendant corporation, its general counsel, and attorney of record for defendant in the instant case, testified that the strike also involved the Checker cabs; that defendant had a record of its cabs that were damaged during the strike but that these records were destroyed in 1938, when defendant settled with the insurance company for the damages to the cabs; that ''maybe fifteen or twenty'' cabs were damaged during the strike; that he saw a picture in one of the newspapers of a cab tipped over during the strike; that prior to March 17 he got reports from defendant's night superintendent of damages done to defendant's cabs; that ''there were windows broken at night by hoodlums and other alleged men. . . . Did you receive any reports from the Night Superintendent of attacks on your drivers prior to March 17, 1937? A. Yes, I remember some of those.'' The witness admitted that the instant suit was started in September, 1937, and that he filed his appearance therein as attorney for defendant on September 30, 1937.

Police Officer Ryan testified that he was assigned to duty in the loop; that on March 11, about nine o'clock p.m., there was a Yellow cab standing in front of a restaurant located on Van Buren street, between State and Plymouth Court. ''The driver was in there, eating and before he came out, a machine pulled up in the street car track and several men got out and started to breaking the windows in the cab. . . . They had sticks and bricks. And I ran down to this place where they were, had them all get out, those that were still in the car get out, and placed them

under arrest''; that he arrested eight men; that the driver in charge of the Yellow cab had on the uniform worn by Yellow cab drivers. Upon the objection of defendant the witness was not allowed to testify as to whether he recognized any of the eight men he arrested as Yellow cab drivers. The officer further testified that on March 13, while he was on duty in the loop, he saw a disturbance in front of the Morrison hotel at Madison and Clark streets, and saw a Yellow cab tipped over and lying on its side in front of the hotel.

Officer Carlson testified that he was detailed to the office of the Public Vehicle License Commission during the month of March, 1937, and on March 15, while he was driving west on Jackson boulevard, he observed four men riding in a car going east; that at Jackson boulevard and Clark street he stopped them and searched the car but found nothing in it; that while he was standing there a brick hit his hat and touched the side of his coat and fell down; that he arrested the four men that were in the car and recognized one of them as a Yellow cab driver; that he had seen him driving a Yellow cab; that around noontime on March 17, at the corner of Market street and Jackson boulevard he saw a Yellow cab ''turned over on the side, standing up against the curbstone.''

That the strike involved numerous acts of violence during the twenty-three days that it lasted conclusively appears from documentary evidence that was offered by plaintiff, but not admitted.

There was filed in the superior court of Cook county a suit entitled *Yellow Cab Company v. City of Chicago,* in which the plaintiff sought to recover from the City for damages to its cabs. The complaint in that case contains, *inter alia,* the following:

''8. *The plaintiff further alleges that the acts of mob violence and rioting which resulted in the injuries and damages to the property of this plaintiff occurred*

in the City of Chicago, on or about the dates herein-
after mentioned, at or about the places mentioned, and
resulted in injury and damage to the property of the
plaintiff, which property the plaintiff avers was not
in transit within the meaning of the said statutes as
aforesaid, in or about the sum mentioned. And the
plaintiff respectfully shows that the said injuries and
damages, as aforesaid, occurred on or about to-wit, as
follows:

| "Cab No. | Date | Place | Amt. of Damage |
|---|---|---|---|
| 641 | 3– 5–37 | 1501 Indiana Avenue | $111.46 |
| 989 | 3– 9–37 | 1400 block N. LaSalle St. | 5.45 |
| 1002 | 3–12–37 | Lake Shore Dr. & Barry Ave. | 220.74 |
| 502 | 3–12–37 | Midway bet. 59th & 60th St. | 133.53 |
| 749 | 3–13–37 | Garland & Washington St. | 3.75 |
| 73 | 3–13–37 | Market St. & Jackson Blvd. | 4.35 |
| 1751 | 3–13–37 | Marquette Rd. at alley between Woodlawn and Minerva | 12.95 |
| 1135 | 3–13–37 | Diversey and Clark St. | 3.75 |
| 749 | 3–13–37 | Garland & Washington St. | 47.40 |
| 726 | 3–13–37 | Larrabee near North Ave. | 42.75 |
| 390 | 3–13–37 | Adams and Franklin Sts. | 39.00 |
| 353 | 3–13–37 | Jackson Blvd. & Franklin. | 39.00 |
| 324 | 3–13–37 | 3700 Sheridan Road | 39.00 |
| 30 | 3–13–37 | Franklin & Harrison Sts. | 24.30 |
| 1191 | 3–14–37 | Foster Ave. & Lake Michigan | 108.22 |
| 1772 | 3–15–37 | Adams & Market St. | 24.30 |
| 711 | 3–15–37 | Jackson Blvd. & Halsted St. | 39.00 |
| 310 | 3–15–37 | 515 Briar Place | 250.00 |
| 29 | 3–15–37 | Van Buren and Sangamon Sts. | 28.85 |
| 905 | 3–16–37 | Eastwood & Sheridan Road | 5.45 |

| "Cab No. | Date | Place | Amt. of Damage |
|---|---|---|---|
| 558 | 3–16–37 | 1134 S. Paulina St. (alley). | 625.00 |
| 391 | 3–16–37 | Van Buren & State Sts... | 5.90 |
| 63 | 3–16–37 | 3200 Broadway............ | 39.00 |
| 1780 | 3–16–37 | Paulina & Madison Sts.... | 26.00 |
| 1634 | 3–16–37 | 44th St. & Lowe Ave...... | 37.30 |
| 1290 | 3–16–37 | 828 Miller Street......... | 28.80 |
| 984 | 3–16–37 | North Ave. & Clark St.... | 5.90 |
| 905 | 3–16–37 | Sheridan Road between Eastwood & Lawrence Ave. ................. | 31.40 |
| 874 | 3–16–37 | Clark & Fullerton........ | 12.90 |
| 86 | 3–16–37 | Adams & Canal Sts........ | 5.95 |
| 1609 | 3–17–37 | 32nd & Wells Sts.......... | 116.74 |
| 549 | 3–17–37 | Market & Randolph Sts... | 64.58 |
| 526 | 3–17–37 | Ogden & Kedzie Ave....... | 625.00 |
| 345 | 3–17–37 | Milwaukee & Division..... | 90.69 |
| 1044 | 3–17–37 | Franklin & Van Buren.... | 19.50 |
| 1258 | 3–17–37 | Milwaukee & Halsted...... | 5.90 |
| 968 | 3–17–37 | North Ave. & Clybourn.... | 11.35 |
| 906 | 3–17–37 | 77th & Green Sts......... | 5.45 |
| 786 | 3–17–37 | 35th & Archer............ | 121.60 |
| 95 | 3–17–37 | Franklin & Van Buren..... | 7.15 |
| 990 | 3–17–37 | Adams & Wabash......... | 12.40 |
| 995 | 3–17–37 | Adams & Wabash......... | 27.60 |
| 526 | 3–17–37 | State & Madison.......... | 16.80 |
| 956 | 3–17–37 | Kedzie & North Ave...... | 27.50 |
| 944 | 3–18–37 | North Ave. & Western..... | 39.00 |
| 896 | 3–18–37 | Milwaukee Ave near Racine Ave. Station......... | 16.65 |
| 735 | 3–18–37 | 12th & Michigan Ave....... | 42.75 |
| 935 | 3–19–37 | Wabash bet. Grand Ave and Ohio St............ | 18.50 |
| 28 | 3–19–37 | Canal & Jackson.......... | 16.80 |
| 1771 | 3–20–37 | 2900 N. Clark St.......... | 11.35 |
| 452 | 3–20–37 | Montrose & Outer Dr...... | 2.80 |
| 352 | 3–20–37 | 2600 N. Clark St.......... | 5.90 |

| "Cab No. | Date | Place | Amt. of Damage |
|---|---|---|---|
| 99 | 3–20–37 | Monroe & Canal.......... | 5.45 |
| 697 | 3–21–37 | 18th & Indiana............ | 39.00 |
| 1775 | 3–21–37 | 75th & South Shore Dr.... | 5.90 |
| 1340 | 3–21–37 | Aldine & Broadway........ | 5.90 |
| 578 | 3–21–37 | Fairbanks Ct. & Ohio St... | 12.75 |
| 990 | 3–22–37 | Kedzie & Roosevelt....... | 5.90 |
| 931 | 3–22–37 | Fullerton & Pine Grove Ave. .................. | 11.35 |
| 842 | 3–22–37 | Lake Shore Drive & Diversey ............... | 5.90 |
| 257 | 3–22–37 | North Ave. & Halsted St... | 11.35 |
| 59 | 3–23–37 | Glenwood & Ridge........ | 45.80 |
| 1109 | 3–23–37 | Glenwood & Ridge........ | 3.75 |
| 55 | 3–23–37 | 11th St. & Michigan Ave... | 12.90 |
| 949 | 3–23–37 | Clark Street.............. | 24.45 |
| 812 | 3–23–37 | Dearborn & Division...... | 5.90 |
| 1586 | 3–23–37 | 1508 N. Dearborn......... | 89.50 |
| 1717 | 3–23–37 | 63rd & Halsted St........ | 5.90 |
| 1148 | 3–23–37 | Foster Ave. & Clark St.... | 11.35 |
| 981 | 3–23–37 | 433 Wrightwood Ave. ..... | 1.70 |
| 960 | 3–23–37 | 18th & Michigan Ave...... | 5.90 |
| 952 | 3–23–37 | Grant Pl. & Clark St...... | 5.45 |
| 881 | 3–23–37 | Schiller & Clark.......... | 11.35 |
| 721 | 3–23–37 | Ardmore & Sheridan Road. | 18.50 |
| 653 | 3–23–37 | 1500 North Clark St....... | 5.90 |
| 565 | 3–23–37 | 2000 North Clark St....... | 11.75 |
| 344 | 3–23–37 | Oakdale & Broadway...... | 5.90 |
| 390 | 3–23–37 | Sheridan Road at Briar and Melrose............. | 7.60 |
| 42 | 3–24–37 | Homan Avenue between Harrison & Polk St...... | 12.95 |
| 1770 | 3–24–37 | 74th St. & Jeffery Ave..... | 5.45 |
| 1789 | 3–24–37 | Jackson Blvd. & Halsted St. | 13.60 |
| 929 | 3–24–37 | 1300 W. Van Buren St.... | 5.90 |
| 309 | 3–24–37 | Van Buren & State Sts.... | 13.60 |
| 1663 | 3–24–37 | 1800 W. Madison St....... | 5.90 |

| "Cab No. | Date | Place | Amt. of Damage |
|---|---|---|---|
| 1168 | 3–24–37 | Washington Blvd. & Ashland .................. | 38.00 |
| 976 | 3–24–37 | Throop & Washington Blvd. .................. | 5.90 |
| 855 | 3–24–37 | Washington & Ogden...... | 5.45 |
| 1557 | 3–24–37 | Washington & Ogden...... | 3.30 |
| 51 | 3–24–37 | 1300 Washington Blvd..... | 11.35 |
| 366 | 3–24–37 | 3700 Sheridan Road....... | 5.90 |
| 68 | 3–25–37 | 320 West Adams St....... | 5.90 |
| 1134 | 3–26–37 | Sheridan Road & Wilson Ave. .................. | 16.40 |
| 1180 | 3–27–37 | 1500 West North Avenue.. | 12.95" |

(Italics ours.)

Plaintiff sought to introduce that part of the complaint that shows the cabs that were damaged prior to March 17, 1937, the amount of damages claimed, and the allegations of the complaint that the injuries and damages to the property of the Yellow Cab Company resulted from acts of mob violence and rioting. The court sustained the objection of defendant upon the testimony of Attorney Samuels that although the suit purports to have been filed by the Yellow Cab Company it was actually filed by the insurance company from which defendant collected damages under a subrogation arrangement made between the insurance company and the Yellow Cab Company. Mr. Samuels testified that Mr. Wolf, who filed the suit against the City, was one of the regular attorneys of the Cab Company and that he recommended Wolf to the insurance company for the purpose of filing the suit; that Wolf got the information as to the cabs damaged from the records of the Yellow Cab Company; that his recollection was that the complaint filed against the City contained a list of the cabs damaged. Section 22, par. 146, ch. 110, Ill. Rev. Stat.

1941 [Jones Ill. Stats. Ann. 104.022], provides: "Any civil action hereafter brought under or by virtue of the subrogation provision of any contract or under or by any subrogation by operation of law shall be brought either in the name of, or for the use of the subrogee; provided, the subrogee shall in his pleading on oath, or by his affidavit where pleading is not required, allege that he is the actual bona fide subrogee and set forth how and when he became such subrogee." The record in the suit against the City does not show that the case was brought by an insurance company or by any subrogee. The complaint in the suit against the City shows that prior to March 17, the date upon which plaintiff was injured, thirty cabs had been damaged, and it alleges that the damages to the cabs were the result of "acts of mob violence and rioting." The complaint also shows that attacks were made upon cabs in all parts of Chicago; that eleven cabs were attacked on March 16 and fourteen cabs were attacked on March 17; in other words, the attacks upon the cabs were reaching a peak at the time of the assault upon the cab in which plaintiff was riding. It is not surprising that defendant fought the introduction of the evidence. While the complaint was not allowed in evidence, we have seen fit to refer to it merely because counsel for defendant contends that the record shows that the City was able to enforce law and order during the strike and that "only a few sporadic acts of violence [were] previously committed, which were immediately taken care of by the police."

Defendant cites the following cases in support of its contention that the trial court should have directed a verdict for defendant:

*Bowman Dairy Co. v. Megan*, 296 Ill. App. 20, was decided by this division of the court. In that case four cars of milk that were being transported by the Railway Company to Chicago were destroyed at Genoa City, Wisconsin, by a group of farmers who were con-

ducting a so-called "milk strike." Suit was brought against the Railroad Company to recover for the loss sustained. After reviewing the evidence and the cases cited, we stated (p. 32):

"The cases cited by the respective parties, allowing recovery against carriers for riot damage, in the main involved affirmative negligence after direct threats or actual knowledge of violence had been received by the carrier, and there are apparently few cases in the books which deal with damage to property in transit by mobs. Some of these cases are collected in a note in 20 A. L. R. 262. Where liability was fixed upon the carrier, however, the courts have invariably found evidence that there was ample time between actual threats of violence and the knowledge thereof, on the part of the carrier, to protect the shipment, and in such cases the courts have said that common prudence would have suggested the propriety of keeping a lookout where a mob, bent on destruction, was operating in close proximity. *The evidence in the case at bar presents no situation of this kind, and the undisputed facts disclose that nothing occurred, up to the time that these milk cars were delivered to the carrier, which would reasonably lead one to suppose that the train transporting them would be attacked and the contents of the cars destroyed.*"

In the *Bowman* case the defendant conceded, in its brief, that recoveries have been allowed against carriers for damages arising out of riots, but contended that in such cases affirmative acts of negligence were shown after direct threats or actual knowledge of violence.

In *Knoxville Cab Co. v. Miller* (Tenn.), 138 S. W. (2d) 428, the plaintiff, a minor about twelve years of age, attended a moving picture show with his mother and sister. When the show was over they ordered a taxicab to take them home, "with a special request that Mr. Miller, the father of plaintiff, who

was a regular driver for the cab company, be sent." The plaintiff sat on the front seat of the cab beside his father, who drove the cab. While the cab was proceeding along a certain street, some person hurled a stone or heavy object through the right window of the cab, striking plaintiff on the right side of the head and injuring him. About a month before this time some labor dispute arose between the cab company and its drivers, as the result of which all but nine of the drivers went on a strike. "In the early stages of the strike some acts of violence had been committed by striking drivers or their sympathizers, but at no time had any passengers been injured, and for several days prior to July 30th no acts of violence had been committed." (p. 429) In its opinion the court states (p. 429): "Mrs. Miller and the boy had full knowledge that a strike was on, and, of course, Mr. Miller, the father of the boy, was acquainted with the whole situation." The court further states (p. 429): "There is nothing to show that there was any peculiar risk incident to the operation of cabs at the time and on the particular street where plaintiff was injured. Mr. Miller was driving his wife and son home and it could well be inferred that he selected the safest route." The court further states that the evidence showed that the father of plaintiff, who drove the cab, was especially fond of his son, and that there was nothing in the evidence to show that he failed to exercise a high degree of care for the safety of his wife and son. The court held that under the peculiar facts of the case the cab company was not liable.

In *Fewings v. Mendenhall*, 83 Minn. 237, the plaintiff recovered damages for personal injuries received while he was riding as a passenger in one of defendant's street cars during a strike of its employees. The opinion states (pp. 239, 240):

"It is to be observed that the complaint charges the defendant with negligence in two particulars only:

First, in failing to exercise due care to protect the plaintiff and other passengers from the violence of the strikers and their sympathizers, which he could have done if he had exercised due care; and, second, in failing to warn him of the dangers likely to arise from such source. The trial court, however, submitted to the jury, in addition to these two, a third ground for recovery, which was, in effect, whether the defendant was negligent in attempting to operate its cars at all at the time the plaintiff was injured, and instructed the jury in substance that if the defendant was negligent in any one of the three particulars specified, and the plaintiff was free from contributory negligence, he was entitled to a verdict. The jury returned a general verdict only, and awarded the plaintiff as damages $4,400. The defendant appealed from an order denying his blended motion for judgment or a new trial.

"The defendant excepted to so much of the charge of the court as submitted to the jury the question as to whether it was negligence for the defendant to operate its cars at all at the time and place in question. The exception was to the effect that the evidence was not sufficient to justify a finding by the jury that the defendant was thus negligent. As already suggested, no such issue was tendered by the complaint, and, if it had been, it would have been inconsistent with at least one of the acts of negligence alleged in the complaint and relied upon as a basis for recovery."

In that case the plaintiff contended that the evidence was sufficient to establish the negligence of the defendant in the two particulars alleged in the complaint. Answering the contention, the court said (p. 241) : "If this be so, then the evidence tends to disprove the further claim that it was negligence to attempt to operate the car. *It was error to submit this last claim to the jury, for which a new trial must be granted.*" (Italics ours.) The court reversed and

remanded the cause for a new trial upon the first and second charges of negligence. The ruling of the court in that case is against the position of defendant in the instant case. The *Fewings* case is also instructive upon two points raised by the defendant in the instant case. Here, defendant contends that "there is no evidence in the record that striking employees of the Yellow Cab Company committed any of the violent acts shown in the record." A similar contention was raised by the defendant in the *Fewings* case. Answering the contention, the court said (pp. 241, 242):

"It is proper, with reference to such trial, to briefly consider two other alleged errors urged by the defendant. The first is the claim that, because the stone which injured the plaintiff was thrown by a third party, who was not one of the strikers, the defendant was not in any view of the case responsible for the resulting injury; that the defendant had a right to assume that all persons, except the strikers, would not only refrain from any acts of violence or lawlessness, but, on the contrary, would use their best efforts to suppress them; hence the defendant had no reason to anticipate the act which injured the plaintiff, and therefore cannot be charged with negligence for not guarding against it.

"This course of reasoning ignores the actual conditions existing at and before the time of the injury. If the conditions had been normal, if there had been no strike, no mobs, no excitement, and no resentment on the part of the strikers and the many who sympathized with them, the claim of the defendant would be correct. But the evidence tends to show that the actual conditions were the reverse of those suggested, and that lawlessness, not order, reigned at and near the place of the injury. It was therefore, upon the evidence, a question for the jury whether the defendant ought not, under the circumstances, to have reasonably anticipated violence from persons not directly

connected with the strikers, and to have exercised due care to protect his passengers therefrom.''

We have heretofore stated that the complaint of the instant defendant in its suit against the City for damages was not allowed in evidence upon the objection of defendant. A similar situation was present in the *Fewings* case, and we quote from the opinion of the court in reference thereto (p. 242):

''The other claim is to the effect that the court erred in receiving in evidence the petition of the receiver to the court, wherein he stated that a general strike had been inaugurated by his employees and gave a general statement of the acts of violence committed and of the interference he had encountered in his efforts to operate his cars. So much of the petition as related to conditions existing and events occurring before the plaintiff was injured was properly received in evidence, as tending to charge the defendant with notice of them.''

In *Bosworth v. Union R. R. Co.*, 26 R. I. 309, the plaintiff was a passenger on one of the defendant's open cars. A strike against the company had been on for some days, accompanied with violence; but the mob had been suppressed by the militia and cars were running regularly. The milita had assumed the duty of keeping the peace and the Railroad Company had been invited to run its cars. When the car in question reached a certain point it was suddenly assailed with a shower of stones thrown from the side of the way and the plaintiff was struck. The court states (pp. 310, 311): ''No one states that there was any uproar or threatening behavior in sight of the car on which the plaintiff was until it reached the crowd. The stones were thrown by those in the rear, next to the houses. One witness testifies that the next preceding car, some fifteen minutes before, had been stoned a little farther down the street towards the center of the city of Pawtucket, but this car had passed out of

sight before the following one appeared." The trial court, in granting the defendant's motion to direct a verdict in its favor, stated (p. 311): "The defendant would not be liable for an injury received by passengers through the throwing of stones by people outside, unless the car was propelled into a place of known danger, and the proof in this case on that point is simply that another car had been stoned. It does not appear to the court that there is sufficient notice to the defendant or sufficient evidence that the dangerous state of things had prevailed for a length of time sufficient so that the defendant could be presumed to have notice. I therefore direct the jury to return a verdict for the defendant." *Bosworth, the plaintiff, upon the appeal took the position that the company was not charged with negligence in dispatching the car to Pawtucket but was charged with negligence in proceeding after the mob was seen in the street,* and in answer to this position the court stated (p. 311) that "there was nothing in the presence and behavior of the crowd to notify the motorman or conductor that there was danger in proceeding, and, therefore, the company is not liable"; that the motorman could not have known that a car had been stoned by these people fifteen minutes before, and that when the stones were thrown against the car in which plaintiff was riding it was in the midst of the crowd and there was no course open to the motorman but to proceed. The court states (p. 312): "If, on sight of the crowd a quarter of a mile away, the car had stopped and refused to carry the plaintiff farther, he might well have complained of breach of duty. Having the same knowledge which the motorman possessed, the plaintiff could have left the car before approaching the crowd if he had chosen to do so. The risk, if any there was, was as obvious to him as to the defendant's servants." Bosworth, the plaintiff, had full knowledge of the situation and it was undoubtedly because of that

fact that his counsel took the position that he did before the Supreme Court. In the *Bosworth* case one of the three judges who passed upon the appeal dissented very vigorously from the opinion of the majority and cited *Chicago & Alton R. R. Co. v. Pillsbury,* 123 Ill. 9, in support of his dissent.

In *Martincich v. Guardian Cab Co.,* 10 N. Y. S. (2d) 308, there was no strike of the Cab Company's employees but there was a strike of seamen which was then in progress. The plaintiff was being driven home in defendant's cab along the water front at an early hour in the morning. *The plaintiff had directed the chauffeur to take this route because it was in the neighborhood of plaintiff's home.* When they reached a certain point a crowd surrounded the cab, turned it over, and injured plaintiff. The court said (p. 309):

"However stringent is the degree of care imposed upon a carrier, a carrier is not liable for the wrongful acts of third persons whose conduct could not have been reasonably foreseen or anticipated. The chauffeur took the route suggested by the plaintiff, it was not shown that he was aware that a strike was in progress, the crowd was not seen until the taxicab was turning a corner into the street of plaintiff's residence; and, above all, there was no reason to suppose that any crowd of men would commit acts of violence."

*Northern Ry. Co. v. Page,* 274 U. S. 65, bears no resemblance to the instant case upon the facts. To quote from the opinion (p. 67):

"On the day before plaintiff was hurt a small insurrection broke out in a part of Costa Rica west of San Jose, the capital. Plaintiff was traveling on the regular morning passenger train running easterly from that city to Port Limon on the Atlantic coast. At Turrialba, about 65 miles from Port Limon, the train was held up by insurrectos. Its seizure was reported to the Governor at Port Limon, and he sent out

a train containing government troops. After detention for some hours the passenger train was allowed to go. The railroad is a single track line having sidings at various places. Both trains were given orders to meet at La Pascua. The passenger train was the first to arrive at that place and went upon the side track to let the troop train pass. The officers of the troop train gave an order to, and the troops did, fire upon the passenger cars. Some passengers were killed and others, including the plaintiff, were seriously injured.''

The Supreme Court, in passing upon the case, stated (p. 75) ''The mere fact that the troops shot into the passenger train does not tend to show that defendant was at fault. And, when regard is had to the facts and circumstances shown by uncóntradicted evidence, it is clear that the shooting was an occurrence that could not reasonably have been anticipated or foreseen as the natural and probable result of any failure of defendant earlier or otherwise to inform the government forces that there were no insurrectos on the passenger train. It follows that there is no ground on which defendant can be held liable for the injuries inflicted on plaintiff by the government forces.'' The trial court in passing upon defendant's motion to set aside the verdict of the jury in the cause stated (p.75): ''The attack took place, apparently, because the officers in command of the troops lost their heads and behaved with incredible folly. It was an extraordinary occurrence which the defendant had no reason to anticipate and for which it is not liable.'' The Supreme Court held that the evidence fully sustained that statement.

The last case cited by defendant,'Woas v. St. Louis Transit Co., 198 Mo. 664, has no application to the instant one upon the facts. There the plaintiff was a passenger on a street car but there was no strike involved. When the street car passed a certain spot

where a man was standing the latter threw a missile into the car and hit plaintiff. The man was not standing at a regular stopping place and he apparently resented the fact that the motorman refused to stop at the place where he was standing. The court held, of course, that there could be no recovery. In its opinion the court states (p. 681): "Knowledge of the existence of the danger or of facts and circumstances from which danger may be reasonably anticipated is necessary to fix the liability of the carrier for damages sustained in consequence of failure to guard against it."

None of the foregoing cases cited by defendant supports its contention that the trial court should have directed a verdict for the defendant. Indeed most of them support plaintiff's contention that under the evidence and the law plaintiff made out a *prima facie* case of negligence against defendant.

In the well known case of *Chicago & Alton R. R. Co. v. Pillsbury,* 123 Ill. 9, *supra,* the plaintiff was injured at the hands of "striking mobsters" while he was a passenger on the defendant's railroad car. The conduct of the strikers was "very violent and threatening." At the time in question there was a strike in progress at the Chicago ore dock of the Joliet Iron & Steel Company. The Company employed men living in Joliet to work at the dock during the strike and the defendant Railroad Company undertook to carry the Joliet men on its railroad from Joliet to their place of labor in Chicago in the morning of each day and to return them to Joliet in the evening of the same day, and the Railroad Company used its passenger trains in performing the service. Plaintiff was a passenger on the train but had no connection with the Joliet Iron & Steel Company or the strikers. While the train was proceeding to Joliet in the evening it stopped at a place not a usual stopping place and took aboard laborers who had taken the place of the strikers. The laborers were placed in the smoking

car, in which the plaintiff was sitting, but he was not informed that it was dangerous for him to remain in the car. The police guarded the laborers until they entered the train. When the train stopped at a railroad crossing, a mile and one half beyond, it was boarded by a mob, who attacked the laborers on the train and shot the plaintiff. There was evidence tending to prove that prior to the time the plaintiff was injured the defendant's officers in charge of the moving of trains might have known, by the exercise of reasonable diligence, that the strike was in existence, and that the strikers were determined to prevent the Company from employing other laborers to do the work they had previously been hired to do. There was also evidence that prior to the time plaintiff was injured there were acts of violence committed by the strikers. It appears that the strikers had no cause of complaint against the Railroad Company nor against the plaintiff, and that their sole purpose was to prevent the Joliet Iron & Steel Company from operating with new employees while the old ones were on strike. The Supreme Court states, in its opinion (pp. 22, 23, 24, 25): ''The carrier, however, must omit no care to discover and prevent danger to a passenger or passengers that is reasonable and practicable. The public exigency and security demand this much of the carrier at all times and under all circumstances. It is the duty of carriers by rail to preserve order in their carriages, and to protect passengers from all dangers, from whatever source, arising on their trains, whether from the dangerous and violent conduct of other passengers or otherwise. To this end all conductors in this State, while on duty on their respective trains, are invested by statute with police power. With regard to danger and hazard to travel arising otherwise than on the train, and not incidents of such travel, the degree of care to be observed to discover and prevent all danger to and consequent injuries to passengers,

must depend in a large measure on the attendant circumstances. No doubt in many cases, if the carrier observes ordinary care and diligence to discover and prevent injury to passengers, such as any prudent person would do for his own personal safety, it will be exonerated from liability. In other cases and under other circumstances it will, no doubt, be the duty of the carrier to exercise the utmost care, skill and diligence to protect the passengers from danger and injury, so far as the same, by the exercise of such care and skill and diligence, could have been reasonably and practicably foreseen and anticipated in time to prevent injury. In no case must the carrier expose the passenger to extra-hazardous dangers, that might readily be discovered or anticipated by all reasonable, practicable care and diligence. It is upon this latter principle, if at all, that defendant can be held liable for the personal injuries received by plaintiff. . . .

"It is said none of the officers had any knowledge the rioters intended to or had any purpose to attack defendant's passenger train at Brighton Park, or elsewhere, at that or at any other time. That is no doubt true. Had the officers of the road been informed the rioters purposed an attack on the passenger train of defendant, at Brighton Park or elsewhere, it would have been criminal negligence to have exposed the passengers to such peril, without a sufficient police protection, and which would have been inexcusable for any reason or upon any ground. No such negligence can be imputed to defendant under the facts of this case. But defendant ought reasonably to have anticipated the mob might attack its train to reach the object of their vengeance, so soon as it had passed from the protection of the police, and precautionary measures should have been taken. Such a thing was likely to occur at any near distance from the central point of the disturbance. A like attack had been made

prior to that time, two miles distant, upon the laborers that had been carried in the box car. On this occasion the mob seems to have been more violent than usual, and the utmost care and vigilance should have been taken to prevent the injury to passengers. The verdict is a sufficient warrant for the conclusion, reasonable precautions were not observed." The judgment against the Railroad Company was affirmed.

After a careful consideration of the instant contention we have reached the conclusion that it is without merit. Defendant states in its brief that "in this state the negligence of a third party does not render the carrier liable unless the carrier could have reasonably anticipated and guarded against the happening."

In connection with the general law bearing upon the instant question the following important fact must be borne in mind: Plaintiff was a stranger in Chicago and had no knowledge of the strike. If, before he became a passenger, he had had knowledge of the strike and that the strikers had been committing acts of violence in connection with the operation of defendant's cabs, a very different question would be presented to us. The attitude of defendant in the matter of warning prospective passengers as to the strike was clearly stated by its president, who testified, as we have heretofore stated, that during the entire strike the cab drivers were ordered to solicit fares but that no orders were issued to the drivers to make any statement about the strike to prospective customers.

As to the argument of defendant that although there was no evidence that prior to the day in question any passengers or drivers had been injured and that therefore there was nothing in the situation that would cause defendant to expect that violence would be committed against plaintiff or any other passenger, it is sufficient to say that the jury had the right to find from the evidence that the attacks upon cabs had a threefold purpose, (1) to intimidate the drivers

from continuing to drive the cabs, (2) to intimidate the public from using the cabs, and (3) to coerce defendant into making a settlement with the strikers. It is idle to argue that violent attacks could be made upon the cabs without endangering the safety of passengers riding therein.

Defendant contends that there is no evidence in the record that striking employees of the Yellow Cab Company committed any of the violent acts shown in the record. We have heretofore referred to *Fewings v. Mendenhall,* where the Supreme Court of Minnesota answered a like contention and adversely to defendant's position.

Defendant contends that the manifest weight of the evidence is in favor of defendant. The sole statement in support of this contention is, "As to this assignment we refer to the argument under assignment Number One." Defendant's contention One is that plaintiff failed to make out a *prima facie* case of negligence against defendant, and the argument in support of that contention has no bearing upon the instant contention.

We find no merit in the contention that the trial court erred in permitting plaintiff to read the deposition of Thomas Hogan, that was taken prior to the trial and pursuant to notice. Defendant, at the taking of the deposition, was represented by its vice president and general attorney, Samuels. Plaintiff's purpose in taking the deposition was to compel the witness to admit that prior to March 17 he had knowledge of acts of violence and threatened acts of violence in connection with the strike. As the knowledge of Hogan upon the said matter would be the knowledge of the defendant corporation, certain of his answers were in the nature of admissions by defendant that it had knowledge of acts of violence committed during the strike and prior to the date of the attack upon the cab in which plaintiff was riding.

Defendant argues that the reading of the deposition was prejudicial to it, although it also argues upon its major contention that neither the evidence of Hogan nor any other evidence tended to make out a *prima facie* case against it. Defendant states that plaintiff should have called Hogan as a witness instead of introducing his deposition. We can readily understand why defendant would have preferred that such a procedure be followed, but plaintiff was not obliged to follow defendant's wishes in the matter, and the deposition was competent evidence. It is clear that plaintiff was forced to call Hogan and Samuels as witnesses in order to bring out important evidence that was practically within the knowledge and control of defendant. As plaintiff argues, the difficulties under which he labored in obtaining facts concerning the number of cabs damaged prior to March 17 and the extent of the damages committed appears from the testimony of Samuels, wherein he states that defendant's records as to damages done to cabs during the strike were destroyed in 1938, although the instant case was started in September, 1937, and Samuels filed his appearance therein as attorney for defendant on September 30, 1937. It must be presumed from the facts and circumstances in evidence that defendant had knowledge as to the acts of violence in connection with the strike, and it is significant that the only witness it called in its defense—save a photographer who took two pictures of North Wacker Drive—was the driver of the cab in which plaintiff rode.

We find no merit in the contention of defendant that the court erred in giving to the jury one of the four instructions given at the instance of plaintiff.

Defendant contends that the amount of the verdict is so excessive as to show passion and prejudice. The attorney for defendant has seen fit to treat plaintiff as a fraud and liar. He argues that while the chauffeur was slugged and beaten, plaintiff was not; that

"this man Rose was not hurt in the riot"; that he needed treatment, but only for old troubles that afflicted him; that after March 17 he spent time in a hospital and received treatments from doctors in order to make defendant pay for treatments for old afflictions. Plaintiff was a substantial business man, sixty-five years of age, and there is nothing in the record to justify the assertion that he is a liar and that his claim is a fraudulent one. As we read the record, the jury were fully warranted in believing plaintiff's evidence. His testimony as to the assault that was made upon him by the mob was corroborated by four witnesses. Mildred Harms testified that the mob knocked the door open, grabbed hold of an elderly man (plaintiff had gray hair), pulled him out, and "he was thrown to the street"; that plaintiff was taken out of the cab on the right side toward her, knocked down and kicked in the face; that the cab was tipped over and a match thrown at the gas tank; that someone hit plaintiff with a club or a stick, about a foot or two long and an inch or two around. Harry Gacek testified that the mob dragged the gray-haired man out of the cab, knocked him down, and as he fell a man kicked him; that after he had lain there a while a few people came over and picked him up and laid him against the building. Rocco DeRose testified that the ringleaders "pulled out the passenger or victim and beat him up." Robert Arthurs testified that the mob got the driver out from one side of the cab and the passenger from the other side; that plaintiff was pulled out and hit over the head with a pipe and that the witness and "some pedestrians" picked him up and laid him on the curb; that "it was a good sized galvanized pipe two inches in diameter, and fifteen to eighteen inches long"; that the passenger that was in the cab was hit over the head with a pipe, over the right eye. The witness identified plaintiff as the passenger that was beaten. The only evidence that

tends to contradict the evidence for plaintiff as to the assault upon him is that of Barney Galecki, the driver of the cab. Galecki identified plaintiff as his passenger, but testified that plaintiff was not hurt; that he got away before the mob started throwing bricks; that in spite of the fact that a big crowd was attacking the witness he was able to notice that plaintiff jumped out of the cab in a hurry and ran to the sidewalk, and that no one was near plaintiff as he ran to the sidewalk; that from the time that plaintiff jumped from the cab and got to the sidewalk no one touched him. Galecki also testified that he held a conversation with plaintiff about the strike before plaintiff entered the cab. He further testified that prior to the attack upon his cab he had never heard that any cabs or drivers had been attacked, and had never heard of any threats of violence against cab drivers; that during the entire strike no one talked to him about it; that his business during the strike was about the same as it was before it. The jury very properly, in our judgment, gave no credence to the testimony of Galecki. In view of the entire evidence upon the subject the argument that plaintiff was not beaten nor injured by the mob is a bold one, to say the least. The evidence shows that plaintiff, in the treatment of the injuries he sustained, has incurred medical, hospital and nurses expenses totaling $2,045. As the verdict was for $5,500, the jury allowed plaintiff $3,455 for the physical injuries he sustained. After reading the entire evidence bearing upon the instant contention we have concluded that the amount of the verdict was certainly not excessive.

We find no merit in the final contention of defendant that there was error in the admission and rejection of evidence that bore upon the question of the alleged injuries.

Defendant argues that if we sustain the verdict it will be tantamount to holding that defendant had no right to carry on its business merely because there

was a strike and some of its cabs had been damaged. It concludes this line of argument with the following: "Furthermore, in this enlightened day, in the second city of the country, it would be a sad precedent to establish, that because there is a strike against a cab company, the company should do obeisance to the strikers. Flex the knee to intimidation and threats of violence, admit the impotence of the law-enforcing authority and the Courts and close down a business which is a necessity to the community, with the resultant loss to the community and to the company. It would be an admission that force and not law governed our city and that mob law was supreme." This argument ignores entirely the rights of plaintiff, a stranger in Chicago, who knew nothing about the strike at the time he became a passenger. At the outset of the case defendant recognized the danger to its defense if plaintiff at the time he became a passenger was not aware of the strike. In its answer it alleged that plaintiff knew, or by the exercise of any diligence whatsoever should have known, that a taxicab strike was in progress at the time of and prior to the time that he entered the taxicab; that he knew, or by the exercise of any diligence whatsoever, could have known or ascertained that rioters, mobsters and strikers might or would attack said taxicab and that if he undertook to ride in said taxicab that he might sustain injuries, and that if plaintiff sustained injuries they were brought about by his own carelessness and negligence. When plaintiff was upon the witness stand, the able counsel for defendant devoted a considerable part of the time taken in the cross-examination in an effort to bring out some fact or circumstance that would tend to show that plaintiff must have heard of the strike and of the violent attacks that had been made upon the cabs before he became a passenger in the cab; the counsel called plaintiff's attention to Chicago papers and papers

published in other States in which there were headlines that referred to the violence of the taxicab strike in Chicago. The trial court submitted to the jury the question of fact as to whether or not plaintiff at the time he became a passenger had knowledge of the existence of the strike or of acts of violence in connection therewith, and the jury by its verdict found that plaintiff had no such knowledge. We are satisfied with that finding.

The judgment of the circuit court of Cook county is a just one and it is affirmed.

*Judgment affirmed.*

SULLIVAN, P. J., and FRIEND, J., concur.

ADDITIONAL OPINION UPON PETITION FOR REHEARING

The late John A. Bloomingston represented defendant Yellow Cab Company upon the trial of the instant cause and in the brief filed in its behalf upon the appeal. He died pending the appeal and five new attorneys who represent defendant in the petition for rehearing have raised points not raised nor argued by Mr. Bloomingston in the original brief and we are therefore filing this additional opinion.

The present counsel contend that the trial court erred in permitting the cause against defendant Yellow Cab Company to go to the jury on count one, which claimed damages resulting from mob violence, and that under sections 512 and 513 of chapter 38, Ill. Rev. Stat. [Jones Ill. Stats. Ann. 37.481, 37.482] such charge could be directed only against the City of Chicago, and that therefore the trial court should have granted defendant Yellow Cab Company's motion to direct a verdict in its favor as to said count. It is a sufficient answer to this contention to say that no such contention was raised or argued in the original brief, wherein the sole complaint made as to the trial court's failure to direct a verdict was that "the court should have directed a verdict for the defendant Yellow Cab Com-

pany. Said Company was not guilty of any negligence and none was proved at the trial." "The law is well settled that the parties cannot for the first time on petition for rehearing raise questions which were not urged or argued on appeal. (*Welch v. City of Chicago,* 323 Ill. 498, 508.)" (*Chicago City Bank & Trust Co. v. Johnson,* 293 Ill. App. 564, 575. .Petition for leave to appeal denied by the Supreme Court, id. p. xliv.) Under the rules of this court (Rule 7) new points cannot be raised even in reply briefs.

Counsel now complain that the court also erred in refusing to direct a verdict for defendant as to counts three and four. What we have said as to defendant's contention as to count one applies to the instant contention.

Counsel now also complain that none of the given instructions advised the jury that defendant Yellow Cab Company could not be held under counts one, three and four, but the only error assigned in the original brief as to instructions was that the court erred in giving to the jury plaintiff's instruction two. All of the instructions asked by defendant were given save one that directed the jury to find that no negligence had been proved against defendant and that the jury find defendant not guilty.

Defendant contends that we misconstrued the purpose for which the deposition of Thomas Hogan was taken and for which it was employed on the trial. In its original brief defendant contended that "it [the deposition] could be used for purposes of impeachment but not as affirmative evidence. . . . The only use to which it could be put was for impeachment or to prove such admissions, if any, as might be competent." *Home Life Ins. Co. v. Franklin,* 303 Ill. App. 146, 150, and *Lange v. Heckel,* 171 Wis. 59, 175 N. W. 788, 791, were cited in support of the contention. In the *Home Life Ins. Co.* case the plaintiff caused the depositions of the defendant Franklin and his wife to

be taken under Rule 135a of the municipal court providing for discovery upon oral interrogatories. The plaintiff did not file the depositions in court and the defendant obtained a rule upon plaintiff to do so. The plaintiff did not offer the depositions in evidence. The defendant Franklin and his wife testified upon the trial in his behalf and defendant offered the depositions in evidence and they were received over plaintiff's objection. Upon the appeal the plaintiff assigned as error the ruling of the trial court in that regard. In its opinion the first division of this court stated (p. 151): ''While the depositions were filed in court and could be used for proper purposes, such as impeachment, or possibly admissions, we think it was not proper practice to permit the defendant to introduce and read the whole of them to the jury and at the same time testify orally. In using these depositions defendant was not attempting to put in evidence the 'answer of any other party.' He was offering his own answers. He was not putting in answers to interrogatories propounded 'by him' but interrogatories propounded by the opposite party. Such practice, if adopted, would make the taking of the evidence of the opposite party upon oral interrogatories prior to the trial and for purposes of discovery extremely hazardous. We are disposed to hold the court erred in this ruling also.'' In *Lange v. Heckel* the plaintiff's deposition was taken at the instance of the defendant. Upon the trial the deposition was offered in evidence by plaintiff and was received over objection of the defendants. Later plaintiff's counsel asked permission to withdraw the deposition, which motion was granted and Lange was placed upon the stand and testified. Upon appeal the defendants contended that it was error to permit the reading of the deposition in evidence and that the error was not cured by the fact that Lange was subsequently placed upon the stand. In passing upon this contention the court said (171

Wis. at p. 69): "It is plain that the admission of the deposition in evidence was error. An adverse examination under sec. 4096 is not the taking of a deposition to be used as evidence upon the trial of the case. The object of such an examination is the obtaining of evidence for the party seeking the examination and against the party to be examined. It may be used in evidence by the party taking it against the party examined as original evidence of admissions made against the interest of the party examined. *Meier v. Paulus,* 70 Wis. 165, 35 N. W. 301." Neither of these cases sustains the contention urged in the original brief and in the petition for rehearing they are not cited nor referred to. Counsel now contend that "it would have been perfectly proper, had this witness been called for adverse examination upon the trial of the case, to use his answers in the discovery proceedings before trial for the purpose of impeachment, or to refresh his recollection under the rules of evidence," but that it was error to admit the deposition over the objection of defendant. No case is cited in support of this contention, but it is argued that Supreme Court Rule 19 (ch. 110, par. 259.19, Ill. Rev. Stat. [Jones Ill. Stats. Ann. 105.19]) supports defendant's position. Paragraph 259.19, so far as it pertains to the instant contention, is as follows:

"259.19. Discovery by Deposition. (1) Any party to a civil action may cause to be taken, on oral or written interrogatories, by deposition before trial, in the manner provided by law for taking depositions in chancery cases, the testimony of any other party or of any other person, which is relevant to the prosecution or defense of the action, and, if hostile, such person may be examined as though under cross-examination.

"(2) When the party or person to be examined is a corporation, joint stock company or unincorporated association, the testimony of one or more of its of-

ficers, directors, managing agents, or employees, which is relevant, may be so taken.''

Paragraph 259.20 reads as follows:

''259.20. Disclosure not Conclusive. No disclosure as to any matter, whether obtained by complaint for discovery or by motion under rules, shall be conclusive, but may be contradicted by other testimony.''

We find nothing in Rule 19 that supports defendant's contention that the only way in which the deposition could be used was for plaintiff to call Hogan to the stand as an adverse witness and ''to use his answers in the discovery proceedings before trial for the purpose of impeachment, or to refresh his recollection under the rules of evidence.'' Such a practice, if followed, would tend to nullify the beneficial purposes of Rule 19. The counsel call attention to the fact that Hogan was not a party to the action. Clause (2) of the rule provides for the taking of testimony of an officer or officers of a corporation. Aside from clause (2) it is an established rule of law that corporations act through their officers. Counsel complain that the introduction of the deposition practically directed the jury to find that the defendant had notice and knowledge of the alleged lawless acts that had been committed during the strike. That the testimony of the witness Hogan tended to prove knowledge of the alleged lawless acts is clear, but under the provisions of Paragraph 259.20 the witness's testimony was not conclusive and defendant, as well as plaintiff, had the right to contradict it by other testimony. The argument now made, that the defense was foreclosed from making a defense in the matter of notice and knowledge of the alleged lawless acts by the admission of the deposition, is such an idle one that it hardly merits notice. It seems to be made as an excuse for the fact that defendant called in its defense only the driver of the cab in which plaintiff rode. Again we wish to

emphasize the statement we made in our opinion as to the difficulties under which plaintiff labored in obtaining facts concerning the number of cabs damaged prior to March 17 as illustrated by the testimony of Samuels that defendant's records as to damages done to cabs during the strike were destroyed in 1938, although the instant case was started in September, 1937, and Samuels entered his appearance as attorney for defendant on September 30, 1937.

Defendant now contends that "it was error for the trial court to permit the entire deposition to be introduced and read to the jury." An examination of the record shows that this is not a fair statement as to what occurred. During the reading of the deposition the able and experienced counsel for defendant, Mr. Bloomingston, exercised his right to object to questions and answers in the deposition. To illustrate: "Mr. Kahn [attorney for plaintiff, reading from the deposition]: 'Q. Did you get any reports as president of your company of any violence involving any of your cabs on the 16th or 17th of March, 1937?' Mr. Bloomingston: Object to that, because that would be merely hearsay, if he got it by way of reports. Mr. Kahn: That would be knowledge. The Court: Read the answer. Mr. Kahn: 'A. "Yes."'' (continues reading) 'Q. Did you, as president of your company, get any reports of any cabs of your company having been destroyed by fire on the 16th or 17th of March, 1937?' Mr. Bloomingston: Object to that, if the Court please. The Court: Yes, he may answer. Mr. Kahn: 'A. Yes.' Mr. Bloomingston: There is no use of my going on and objecting to these because I will simply disturb the continuity. This man is simply a witness; and, as a witness, he can testify only to what he knows himself; and I am objecting to any reports, or anything that is hearsay. I have no objection to anything which he personally knows of his own knowledge. Mr.

Kahn: I am not attempting to prove the facts. That he had knowledge, that it was reported to him, and that there were. The Court: For the purpose of show-ing notice he may proceed. Mr. Bloomingston: Show-ing notice of what? The Court: Alleged violence.'' Mr. Bloomingston then had an understanding with the court that an objection might be noted after each question and answer upon the subject of alleged no-tice to defendant. Mr. Bloomingston thereafter, dur-ing the reading of the deposition, made a number of objections to questions and answers in the deposition and the trial court sustained three of his objections. In the original brief no complaint was made that cer-tain questions and answers were not competent. The sole point made was that the deposition could not be used as original evidence. A reading of the transcript satisfies us that the trial court was ready and willing to pass upon the competency of any question and an-swer in the deposition to which objection was made.

The petition for rehearing is denied.

*Petition for rehearing denied.*

Sullivan, P. J., and Friend, J., concur.