ESTATE OF SHANNON WHITTINGTON, Deceased, *et al.*, Plaintiffs-Appellants, *v.* EMDEKO NATIONAL HOUSEWARES, INC., *et al.*, Defendants-Appellees.

First District (1st Division)    No. 80-727

Opinion filed May 18, 1981.—Rehearing denied June 22, 1981.

1008

Joseph R. Curcio, Ltd., of Chicago (D. L. Bertelle, of counsel), for appellants.

Frank J. Pause and Robert O. Duffy, both of Beverly, Pause, Duffy & O'Malley, of Chicago, for appellees.

Mr. JUSTICE McGLOON delivered the opinion of the court:

Plaintiffs filed an action based on strict liability in tort against the manufacturer of heat detectors. Judgment was entered on the jury verdict in favor of defendants. Plaintiffs appeal.

On appeal, plaintiffs argue that (1) the trial court improperly excluded evidence of the cost of alternative design; (2) their witness was improperly impeached; (3) defendants' wilful noncompliance with discovery requests entitles them to a new trial; (4) the conduct of an adverse witness denied plaintiffs a fair trial; (5) defendants prejudicially injected concepts of contributory negligence; (6) defendants' expert witness improperly testified to the safety of instructions; (7) defense counsel's closing argument was improper and prejudicial; (8) a juror erroneously

was permitted to take notes; and (9) the jury verdict was not supported by the evidence.

We affirm.

On April 1, 1974, four persons perished in a fire. An action was brought by the personal representatives of the deceased estates against, *inter alia*, the manufacturer of heat detectors which had been installed in the home where the fire occurred. The complaint charged that defendants improperly designed and manufactured the detectors and that the detectors were unreasonably dangerous when put to their foreseeable use. It further alleged that the detectors were unreasonably dangerous without adequate warning and that no warning was given.

At trial, Mrs. Walker, an owner of the home in which the fire occurred, testified that she purchased eight detectors in 1970. Her husband or another member of the family installed four on the second floor of the home and four on the first floor. Her husband maintained the alarms.

During the fire, Mrs. Walker attempted to go upstairs where the deceased were sleeping but was prevented by heat and smoke. She then sought assistance from her neighbor who placed a ladder at the window of a bedroom. He broke a window but flames burst out and he was unable to rescue anyone.

She further testified that she believed the alarms were in working order at the time of the fire. An alarm placed in the kitchen had sounded about two months before the fire. On the night of the fire, none of the alarms sounded.

On cross-examination, Mrs. Walker was impeached with her deposition testimony that she could not remember whether the alarms had sounded during the fire. She testified that she had seen flames at the stairway but was impeached with her deposition stating she could not recall whether she had seen flames. She could not recall whether the batteries had ever been replaced and was impeached by an answer to an interrogatory which stated that the batteries had never been changed.

Plaintiffs' expert witness Robert Bambenek testified that he performed three types of tests on two alarms removed from the Walker residence after the fire and on another alarm which was produced by defendants during discovery as an exemplar of the alarm. Mr. Bambenek's opinion, based upon his inspection and testing of the alarms and his engineering and scientific background, was that the alarms were defectively designed.

Bambenek testified that the alarm was defective because it detected heat only and contained no warning that it did not provide any protection from asphyxiation from carbon monoxide, a gas present in all fires. A second defect was the absence of a low-power warning signal. This is

required by the National Fire Protection Association Standard of 1967. He further testified that the battery case was too fragile and that the battery holder was too pliable and could be bent so as to prevent the batteries from making contact with the horn. In Bambenek's opinion, stranded wire, rather than solid wire used in the alarms should have been used to connect the battery clip to the horn. Solid wire would weaken and break more easily with repeated battery replacement. Because the thermostat protruded through the cover of the alarm, Bambenek believed it should have been covered or protected in some way to prevent damage in the event the alarm were dropped. He was also of the opinion that the alarms were improperly tested before they left the factory.

On cross-examination, Bambenek testified that the Underwriter's Laboratory standard which he followed in performing one of his tests had not been promulgated until 1971. He did not know in which year the low-power warning devices became available for home appliances. He further testified he had not tested the batteries from plaintiffs' exhibits Nos. 4 and 5 and did not know if they were charged. If the batteries had not been changed from October 1970 to April 1, 1974, the alarm would not work since the average life span of the batteries was two years. He further testified that the National Fire Protection Association Standard of 1967 did not permit battery operated alarms.

Defendants called Captain William Hoppe, a fire fighter present at the fire. Hoppe was dismissed after plaintiffs stipulated that the detectors were not the cause of the fire.

Defendants' expert witness Eugene Byrne testified that he inspected the detectors in August 1979. He performed no operational tests on the thermostats because such tests had no bearing on the condition of the detectors at the time of the fire. The detectors in evidence which had been removed from the Walkers' home had broken test switches and corroded batteries. The batteries were improperly installed.

He further testified that he was familiar with the National Fire Protection Association (NFPA) standard promulgated in 1967. This standard did not require low-power warning signals on battery operated heat detectors. It did not ban or recommend against the use of battery operated devices and in fact contained provisions permitting battery powered detectors. It also provided for the use of solid wire. Byrne stated that the detectors were reasonably safe products in design and manufacture and that the instruction sheet in evidence was reasonable.

On cross-examination, Byrne testified that the instructions did not give detailed information on battery installation and placement. He read portions of the NFPA standard which stated that household warning systems should include smoke detectors for protection from smoldering fires which give off little heat. He further testified that the detectors were

excellent types of detectors, especially in industrial settings, but were not specifically designed for personal protection.

On redirect, Byrne testified that the detector's alarm will not sound when tested if the batteries are improperly installed. The instructions advise that the detector should be tested once each month. He further testified that the battery case and mechanism is approximately the same as that in a flashlight.

First, plaintiffs argue that the trial court erred in precluding their expert witness from testifying to the specific cost of installing a low-power warning signal in the detectors.

■■ The expert testified that the warning signal was an inexpensive addition. Hence, the evidence sought to be admitted was cumulative in nature, and error, if any, resulting from its exclusion was harmless error. *In re Estate of Veronico* (1979), 78 Ill. App. 3d 379, 396 N.E.2d 1095; *O'Brien v. Walker* (1977), 49 Ill. App. 3d 940, 364 N.E.2d 533.

The second allegation of error in this case arises from the impeachment of Mrs. Walker. Plaintiffs maintain generally that an interrogatory cannot be used to impeach because it is designed to test the knowledge of the attorney as well as the client. They further contend that the interrogatory was used improperly to impeach because it was not signed by Mrs. Walker, but by her attorney.

■■ We first note that interrogatories may be used to the same extent as discovery depositions. (Ill. Rev. Stat. 1979, ch. 110A, par. 213(f).) Discovery depositions may be used to impeach. (Ill. Rev. Stat. 1979, ch. 110A, par. 212(a)(1).) Ergo, interrogatories may be used to impeach. Granted, interrogatories may be directed to the knowledge available to counsel and litigant (*Smith v. Realcoa Construction Co.* (1973), 13 Ill. App. 3d 254, 300 N.E.2d 855, citing *Battershell v. Bowman Dairy Co.* (1961), 37 Ill. App. 2d 193, 185 N.E.2d 340); however, this fact does not preclude the use of an interrogatory for impeachment.

*Castle v. Searles* (1940), 306 Ill. App. 2d 304, 28 N.E.2d 619, and *McNealy v. Illinois Central R.R. Co.* (1963), 43 Ill. App. 2d 460, 193 N.E.2d 879, are cited by the plaintiffs in support of their contention that a document not signed by a witness cannot be used to impeach. However, these cases are distinguishable. In *Castle*, it was held that the trial court correctly rejected an attempted impeachment of a witness with a written statement where there was no evidence that the witness knew of the writing or authorized the signatures. Here, however, plaintiffs' counsel stated in his discussion with the court that he had signed the interrogatories as an agent for Mrs. Walker. In *McNealy*, there was no showing that the witness knew anything about the contents of the interrogatory answer. The interrogatory was not signed under oath, and the witness' attorney stated that it had been signed by someone in his office. In the case at bar,

the interrogatory was notarized and stated that Edna Walker had sworn to the accuracy of the matters contained therein.

■■ The fact that a document is not signed by the witness does not render it incompetent for impeachment purposes. (See *People v. Wilson* (1981), 92 Ill. App. 3d 370, 415 N.E.2d 1315, citing *People v. Berryman* (1958), 13 Ill. 2d 229, 148 N.E.2d 745, and *People v. Dogoda* (1956), 9 Ill. 2d 198, 137 N.E.2d 386.) As noted above there was sufficient evidence that Mrs. Walker swore to the contents of the interrogatory and authorized her attorney to sign. Hence, the trial court did not err in allowing the document to be used for impeachment purposes.

Third, plaintiffs argue that they are entitled to a new trial because of defendants' failure to produce documents requested during discovery. Of the 60 items requested by plaintiffs in their pretrial motions to produce, they complain of the nonproduction of the following: (1) records relating to the malfunctioning of alarms returned for repairs, (2) patent applications on the heat detectors, (3) production run information, and (4) a letter from Underwriter's Laboratory in which it threatened to withdraw its stamp of approval.

■■ After being called as an adverse witness, Joseph Bargiel was questioned about items which had not been produced. Upon learning that some may have existed and were not produced, plaintiffs did not choose to seek sanctions. Instead, they presented evidence to the jury of defendants' incomplete disclosure and had the jury instructed on the negative inference which could arise because of defendants' failure to produce. The failure to produce was then raised as a basis for a new trial in plaintiffs' post-trial motion.

The decision to grant or deny a motion for a new trial rests within the discretion of the trial court. (*Laff v. John O. Butler Co.* (1978), 64 Ill. App. 3d 603, 381 N.E.2d 423; *Brown v. Johnson* (1978), 60 Ill. App. 3d 76, 378 N.E.2d 757.) We do not believe that an abuse of discretion has been shown. Plaintiffs extensively questioned Bargiel on the existence or availability of the documents requested. The jury was appropriately instructed.

Fourth, plaintiffs argue that the trial court should have controlled the conduct of Bargiel while he testified as an adverse witness called by plaintiffs.

It is the duty of the trial court to control the proceedings before it to insure that the litigants receive a fair trial. (*City of Chicago v. Pridmore* (1957), 12 Ill. 2d 447, 147 N.E.2d 54; *Wanner v. Keenan* (1974), 22 Ill. App. 3d 930, 317 N.E.2d 114.) In doing so, the court is accorded wide latitude. *Crump v. Universal Safety Equipment Co.* (1979), 79 Ill. App. 3d 202, 398 N.E.2d 188; *Eckley v. St. Therese Hospital* (1978), 62 Ill. App. 3d 299, 379 N.E.2d 306.

The record indicates that the court struck the answers of the witness several times upon plaintiffs' objections. The witness was also instructed to answer the questions asked and add nothing more. We cannot say, from looking at the record alone, that Bargiel's conduct and alleged incorrigibility were prejudicial, particularly in light of the trial court's observation that plaintiffs' counsel was aggravating the situation. For these reasons, we find that the trial court did not fail in its duty to properly conduct the trial.

Fifth, plaintiffs maintain that during defendants' direct examination of Mr. Byrne, defendants prejudicially and improperly injected the concept of contributory negligence. Defendants began questioning Mr. Byrne about standards regarding responsibility for choosing alarm systems based on the degree of protection desired. Byrne testified that such a standard existed and identified it as a National Fire Protection Association standard promulgated in 1976. Upon sustaining plaintiffs' objection to the use of the standard, the trial court struck all questions and responses pertaining thereto and the jury was instructed to disregard any reference to the standard.

■■ Concepts of contributory negligence are irrelevant in strict product liability actions since contributory negligence does not bar recovery in strict liability cases. (*Sweeney v. Max A. R. Matthews & Co.* (1970), 46 Ill. 2d 64, 264 N.E.2d 170; *Ostendorf v. Brewer* (1977), 51 Ill. App. 3d 1009, 367 N.E.2d 214.) Assuming *arguendo* that the colloquy between Byrne and defense counsel injected notions of contributory negligence, we nonetheless find that plaintiffs were not prejudiced. The colloquy was brief, the reference to choice of levels of protection was minimal, and all references to the standard were stricken.

Sixth, plaintiffs argue that the trial court erred in allowing Byrne to express his opinion on the reasonableness of the instructions which accompanied the alarms. They contend that Byrne was not qualified to express an opinion because he had no expertise in the field of technical writing.

■■ The decision to allow or exclude expert testimony is a matter within the sound discretion of the trial court. (*Voss v. Lakefront Realty Corp.* (1977), 48 Ill. App. 3d 56, 365 N.E.2d 347; *Schwartz v. Alton & Southern Ry. Co.* (1976), 38 Ill. App. 3d 528, 347 N.E.2d 829.) We do not believe that the trial court abused its discretion. The record indicates that Byrne was a qualified engineer and physicist. Plaintiffs do not object to these qualifications. During his career, Byrne had extensive experience with electrical, mechanical and optical equipment. He also worked on projects wherein heat detection devices were used. Byrne's opinion was based upon his professional and scientific knowledge and his familiarity with the detectors involved in this case.

Seventh, it is argued that defendants' closing argument was prejudicial. Plaintiffs specifically cite as error the argument that Mrs. Walker's failure to produce the two detectors remaining in her possession gave rise to a presumption that the evidence would have been unfavorable.

■■ The factors giving rise to the unfavorable presumption are a notice to produce evidence (see 1 S. Gard Illinois Evidence Manual Rule 3:24, at 105 (2d ed. 1979)) and a wilful withholding of such evidence. (*Haynes v. Coca Cola Bottling Co.* (1976), 39 Ill. App. 3d 39, 350 N.E.2d 20, citing *Village of Princeville v. Hitchcock* (1901), 101 Ill. App. 588.) There is no indication in the record that Mrs. Walker was requested to produce the other detectors removed from her home after the fire. Her failure to do so was not, therefore, a wilful withholding of evidence giving rise to the unfavorable presumption. Defendants' closing argument was therefore improper. Nonetheless, the error was harmless because plaintiffs were permitted to respond and rebut the allegations in their closing argument. See *Couillard v. Elgin, Joliet & Eastern Ry. Co.* (1974), 21 Ill. App. 3d 914, 316 N.E.2d 541.

Eighth, plaintiffs raise the issue of whether a juror may take notes during trial. They argue that in this case, a juror was improperly permitted to take notes. The record reveals that the juror had a note pad in his possession when the trial began. There is no indication that any notes were taken.

In Illinois, there are no cases forbidding note-taking by a juror of his own volition. Cases in which the issue has been addressed hold only that counsel cannot request or suggest that a juror take notes. *Indianapolis & St. Louis R.R. Co. v. Miller* (1874), 71 Ill. 463; *Kelley v. Call* (1944), 324 Ill. App. 2d 143, 57 N.E.2d 501.

The Illinois statute regarding this topic provides in pertinent part as follows:

"Nothing contained in this section shall be construed to prohibit the taking of notes by a petit juror in any court of the State of Illinois in connection with and solely for the purpose of assisting him in the performance of his duties as such juror." (Ill. Rev. Stat. 1979, ch. 78, par. 36.)

This statute appears to grant jurors an absolute right to take notes. However, this may not have been the intent of the legislature in enacting the statute. See A. Newell, *May a Juror Take Notes in Illinois*, 46 Chi-Kent L. Rev. 223 (1969).

Nonetheless, we need not decide this issue on the merits for, as noted above, there is no indication that the juror in fact took notes during trial. Hence, there is nothing from which we can determine whether plaintiffs were prejudiced. Furthermore, there is no evidence that the juror was requested by counsel to take any notes. Plaintiffs' contention that they

were prejudiced by the trial court's erroneous ruling permitting a juror to take notes is without merit.

Ninth, plaintiffs argue that the evidence was insufficient to support the jury verdict in defendants' favor on the issue of failure to warn. Specifically, they contend that no evidence was introduced indicating that the instruction sheet (defendants' exhibit No. 1) accompanied the detectors when purchased. As support, they cite Mrs. Walker's inability to recall reading or seeing the instructions and Bargiel's inability to remember whether instructions accompanied the alarm.

This contention is premised, in part, on a misapprehension of Bargiel's testimony. Bargiel testified that the instructions accompanied the detectors. The item he could not recall was another leaflet referred to in these instructions. Furthermore, plaintiffs' counsel admitted during closing argument that the instructions were enclosed with each detector.

The jury had, for its consideration, defendants' exhibit No. 1. This informed the purchaser of the proper place to mount the detector. It further stated that the batteries and detector should be checked once each month. Also included was a brief instruction on changing the batteries.

For the foregoing reasons, we affirm the judgment of the circuit court of Cook County.

Judgment affirmed.

GOLDBERG and O'CONNOR, JJ., concur.