RUSSELL OGG, Special Adm'r of the Estate of Jana Louise Welch, Deceased, Plaintiff-Appellee and Cross-Appellant, *v.* THE CITY OF SPRINGFIELD *et al.*, Defendants—(The City of Springfield, Defendant-Counterplaintiff-Counterdefendant and Third-Party Plaintiff-Appellee and Cross-Appellee; Coast Catamaran Corporation *et al.*, Defendants and Counterdefendants-Appellants and Cross-Appellees; John Homier, Third-Party Defendant; Philip Henrici, Counterplaintiff and Third-Party Defendant-Appellee and Cross-Appellant; James Henneberry, Counterdefendant).

Fourth District   No. 4—83—0069

Opinion filed January 5, 1984.

28

Grady E. Holley and John L. Swartz, both of Giffin, Winning, Lindner, Newkirk, Cohen & Bodewes, P.C., of Springfield, for appellants.

Richard G. French, of French, Rogers, Kezelis & Kominiarek, P.C., of Chicago, for appellee Philip Henrici.

Frederick P. Velde, of Heyl, Royster, Voelker & Allen, of Springfield, for appellee City of Springfield.

Londrigan & Potter, P.C., of Springfield, for appellee Russell Ogg.

PRESIDING JUSTICE MILLS delivered the opinion of the court:
A sailboat accident on Lake Springfield.
Two deaths.
A products liability suit against the sailboat's manufacturer.
A jury verdict for the plaintiffs.
We affirm.

## I. THE FACTS

### A. THE ACCIDENT

On a Sunday afternoon in the middle of August, Philip Henrici, Jana Welch, and Donna Ballweg set out sailing on Lake Springfield in a Hobie Cat catamaran. Henrici was controlling the main sail and manning the tiller. Welch was operating the jib sail. The trio sailed south on the lake and then came about and headed north. Because the center channel of the lake was crowded with power boats and skiers, Henrici guided the Hobie Cat through the water along the shore.

Suddenly, the rear of the Hobie Cat dipped down momentarily and Henrici received a tremendous electrical shock. Then the main sail's boom fell, hit him on the right arm and came to rest on the tiller crossbar which connected the two rudders. Henrici crawled forward to where Welch and Ballweg were sitting and started to haul the main sail the rest of the way down. As he did so, he looked up and saw that the mast of the Hobie Cat had become entangled in some low hanging power lines strung across the lake. The boat rocked, the mast touched the lines, and bright blue bubbles rose from the water around the boat.

The trio remained calm. Several persons in a passing power boat stopped and offered their assistance. At first, Henrici declined but then he agreed to allow them to tow the Hobie Cat away from the power lines. But before the would-be rescuers could throw Henrici a tow rope, the waves began to rock the sailboat and the mast struck the power lines several times. Each time the mast hit the lines, the sailboat shuddered as the electricity passed through it and bright blue flames erupted from the mast and yellow flames shot out of both ends of the boat. Flames began rolling out from beneath the center of the boat.

Everyone on both boats became very excited and began screaming. Someone yelled for the trio to jump into the water. In an apparent panic, Ballweg jumped off the front of the Hobie Cat and Welch jumped off the back. Henrici remained on the sailboat and threw Ballweg a life jacket. Welch began swimming toward the power boat. The Hobie Cat rocked and its mast hit the power lines. The electricity traveled through the boat and into the water. Both girls went limp and slipped beneath the water.

Henrici was rescued and taken to a hospital. The bodies of the girls were later recovered by divers. The coroner's report was that the cause of their death was electrocution.

## B. THE HOBIE CAT

The sailboat the trio was sailing the day of the accident was a Hobie Cat 16 catamaran, manufactured by Coast Catamaran Corporation, a subsidiary of Coleman Company, Inc. The Hobie Cat is a twin-hulled sailboat. On top of the two hulls and connecting them together is a square aluminum frame. A canvas, trampoline-type surface—commonly called a wing—is stretched across the aluminum frame. The entire assembly is supported by four aluminum posts which run down into the hulls.

Two parallel rudders, connected by an aluminum tiller crossbar, are used to steer the Hobie Cat. Each rudder is capped with an aluminum tiller head, which is connected to an aluminum tiller which, in turn, is connected to either end of the tiller crossbar. A long hiking stick is attached to the center of the tiller crossbar, thereby enabling the person operating the rudders to sit on either side of the wing.

An aluminum mast rises from the front of the aluminum frame and is attached to the boat at a metal mast base. The Hobie Cat has two sails—a main sail in the rear and a jib sail in the front. The main sail is connected along its bottom to an aluminum boom and the boom attaches at a right angle to the mast at a hinged joint. A warning sticker on the mast reads:

> *"Caution*
> Aluminum mast and other metal components conduct electricity. Coming in contact and/or near an electrical power line can cause serious injury or death! Stay away from overhead electrical power lines when sailing and/or launching this boat."

## C. THE PROCEDURE BELOW

(Note: Due to the complex nature of the procedure below and in the interest of brevity, only the most general procedural steps will be outlined here. All other relevant procedural facts will be discussed in the analysis of the issues.)

Acting as special administrator of Jana Welch's estate, her father, Russell Ogg, brought suit against Coleman Company, Inc., and the city of Springfield. He later amended his complaint to add Coast Catamaran Corporation as a defendant. He alleged that the city had committed several negligent and wilful and wanton acts with regard to the maintenance of the power lines over Lake Springfield. His claims against Coast and Coleman were based on his allegations that the Hobie Cat was manufactured and distributed in an unreasonably dangerous condition. He alleged that the design of the sailboat using aluminum components allowed electricity entering the mast to travel

through the boat and into the water, thereby endangering persons in the water.

The city filed a third-party complaint against Henrici and he in turn filed a claim against both the city and Coast. In his countercomplaint, Henrici alleged that witnessing the deaths of the two girls had caused him great mental and emotional anguish, resulting in physical illness. Before the accident, Henrici had suffered from Crohn's disease, necessitating surgery. He claimed that the stress he suffered as a result of the accident caused the worsening of his condition.

Coast and Coleman filed counterclaims against the city seeking contribution for the amount of any judgment entered against them in favor of Ogg. They also filed cross-claims against Henrici seeking the same. Henrici then filed a counterclaim against Coleman. The trial judge later granted Henrici's motion to dismiss Coast and Coleman's cross-claims.

A trial was held and the jury returned a verdict in favor of Ogg for $100,000 and Henrici for $175,000. The jury also found that Coast and Coleman had not acted wilfully and wantonly and therefore did not assess any award against them for punitive damages. The trial judge later granted the city's motion for a judgment *n.o.v.* as to Coast and Coleman's claims for contributions.

After several unsuccessful post-trial motions by each of the parties, Coast and Coleman appealed seeking a new trial on the issue of liability, and Ogg and Henrici cross-appealed seeking a new trial on their claims for punitive damages.

## II. Coast And Coleman's Appeal

### A. COLEMAN'S LIABILITY

#### 1. PARENT COMPANY LIABILITY

In the first issue on appeal, Coleman argues that the judgments entered against it must be reversed because the plaintiffs, Ogg and Henrici, failed to prove that it was the manufacturer of the Hobie Cat and therefore it is under no liability for any injuries caused by the boat. We disagree.

●▪ In Illinois, the law is clear that a company which holds itself out to the public as the manufacturer of a product is liable for the injuries caused by that product if it is found to be unreasonably dangerous. (*Connelly v. Uniroyal, Inc.* (1979), 75 Ill. 2d 393, 389 N.E.2d 155.) Also, a parent company which participates in the manufacture,

marketing, and distribution of an unsafe product, or which derives economic benefit from placing it in the stream of commerce, or which is in a position to eliminate the unsafe character of the product *is liable* for the loss caused by the product. *Hebel v. Sherman Equipment* (1982), 92 Ill. 2d 368, 442 N.E.2d 199.

The jury in the present case heard testimony that in 1976 Coleman acquired all of Coast's stock and installed one of its own officers as chairman of the board and president of Coast. Coleman then instituted a policy requiring product development committee meetings every month at Coast. The committee was responsible for all design changes in Coast's existing products, including the Hobie Cat 16. Chief executive officers from Coleman received copies of the committee's minutes and attended several of the meetings. In addition, the Hobie Cat 16 instruction and assembly manuals issued in 1978—the year of the accident—stated that the Hobie Cat was a Coleman Company product.

After hearing the above evidence, the jury found Coleman liable for the injuries caused by the accident. Because Coleman exercised some control over the design of the Hobie Cat, was identified in certain Hobie Cat literature, and received economic benefit from the sale of the boats, such facts provided a sufficient basis for the jury's finding.

### 2. STATUTE OF LIMITATIONS

Next, Coleman argues that Henrici's judgment against it must be reversed because Henrici's cause of action was barred by the statute of limitations. When Henrici filed his claim against Coast, he did not name Coleman as a defendant. Later, Coleman filed a claim seeking contribution from Henrici and after the applicable statute of limitations had run, Henrici amended his complaint to name Coleman as a defendant. When the trial judge granted Henrici's motion to dismiss Coleman's claim, Coleman filed a motion to dismiss Henrici's claim against it, alleging that his claim was barred by the statute of limitations. Coleman's motion was denied.

On appeal, Henrici argues that Coleman waived the statute of limitations when it filed its claim against him. Coleman contends that because its claim against Henrici was dismissed, the waiver of the statute of limitations was rescinded. Henrici is correct.

Section 13—207 of the Code of Civil Procedure (Ill. Rev. Stat. 1981, ch. 110, par. 13—207) states in pertinent part:

> "A defendant may plead a *** counterclaim barred by the statute of limitation, while held and owned by him or her, to any

action, the cause of which was owned by the plaintiff or person under whom he or she claims, before such set-off or counterclaim was so barred, and not otherwise."

Section 13—207 does not contain a requirement that the claim which initiates the waiver must be successful or withstand a motion to dismiss in order for the waiver to remain in effect. Instead, the saving clause simply provides that if a party files a claim, he must sacrifice the protection of the statute of limitations.

The saving clause opens the door and exposes the initiating party to otherwise stale claims. The clause *does not* contain a provision which closes the door if the initiating party's claim is later dismissed. In sum, once the statute of limitations is waived, it remains waived even if the claim which triggered the waiver is later dismissed.

B. JURY INSTRUCTIONS

Coast and Coleman both argue that, under our supreme court's recent decision in *Coney v. J. L. G. Industries, Inc.* (1983), 97 Ill. 2d 104, 454 N.E.2d 197, the trial judge erred when he refused to instruct the jury that Henrici's total amount of damages should be reduced in proportion to the amount of his contributory negligence. *Coney*, however, was not the law when the trial judge instructed the jury, when he entered judgment on the jury's verdict, or when he denied Coast and Coleman's post-trial motions. The law during that period was that ordinary contributory negligence was not a defense to a strict products liability claim. (See *Williams v. Brown Manufacturing Co.* (1970), 45 Ill. 2d 418, 261 N.E.2d 305.) And because we believe that *Coney* should not be applied retroactively, it is not necessary for us to decide whether *Coney* changed that rule.

■ Although the supreme court did not state in *Coney* whether the decision should be applied retroactively or prospectively, in the past the supreme court has applied decisions which radically change existing tort law prospectively. (*E.g., Alvis v. Ribar* (1981), 85 Ill. 2d 1, 421 N.E.2d 886; *Skinner v. Reed-Prentice Division Package Machinery Co.* (1977), 70 Ill. 2d 1, 374 N.E.2d 437.) And in *Molitor v. Kaneland Community Unit District No. 302* (1959), 18 Ill. 2d 11, 27, 163 N.E.2d 89, 97, the supreme court stated, "an overruling decision should be given only prospective operation whenever injustice or hardship due to reliance on the overruled decisions would thereby be averted."

■ The situation in the present case clearly meets that test. Therefore, we hold that the new rule in *Coney* should be applied prospectively. Consequently, the trial judge did not err when he refused

to give the contributory negligence instructions.

■ Coast and Coleman also argue that the trial judge erred when he refused to instruct the jury concerning Welch's alleged contributory negligence. This issue was waived, however, by Coast and Coleman's failure to raise it in their post-trial motions. Furthermore, as we just discussed, the law at the time of the trial was that ordinary contributory negligence was not a proper defense to a strict products liability claim. No error.

■ Coast and Coleman also argue that the trial judge should have instructed the jury that it was their position that Henrici assumed the risk of using the sailboat. Coast and Coleman, however, never tendered an assumption-of-risk instruction. After failing to tender such an instruction, Coast and Coleman cannot now argue on appeal that it should have been given. No error.

## C. CONTRIBUTION

During the extensive procedural gamesmanship which preceded the trial, Coast and Coleman filed counterclaims seeking contribution from both Henrici and the city of Springfield. The trial judge dismissed the counterclaims against Henrici and granted the city's motion for a judgment *n.o.v.* on the counterclaims against it. On appeal, Coast and Coleman argue that under the supreme court's decision in *Coney*, they should have been allowed to seek and receive contribution from Henrici and the city. Because we have already determined that *Coney* does not apply in this case, we must decide this issue using pre-*Coney* law.

The law in pre-*Coney* cases was that a strict products liability defendant may seek contribution *only* from a party who contributed to the plaintiff's damages either by misusing the product or by assuming the risk of using an unsafe product. (*E.g.*, a plaintiff's employer who improperly used a machine or assumed the risk of using a defective machine.) See *Skinner; Stevens v. Silver Manufacturing Co.* (1977), 70 Ill. 2d 41, 374 N.E.2d 455.

■ Because the city did not use the sailboat in any manner, under pre-*Coney* law it is not liable for contribution for the damages caused by the boat. And, although it is apparent that Henrici used the Hobie Cat, Coast and Coleman have failed to raise or prove that his misuse or assumption of the risk contributed to Welch's injuries. Consequently, the trial judge did not err when he dismissed the counterclaims against Henrici or when he granted the city's motion for a judgment *n.o.v.*

## D. FEASIBLE ALTERNATIVE DESIGN

### 1. BURDEN OF PROOF

During the trial, the plaintiffs, Ogg and Henrici, attempted to establish that a safer, feasible alternative design for the Hobie Cat existed. For example, they questioned several witnesses concerning their familiarity with other boat designs and concerning the possible performance of electrical tests on certain nonmetallic components of other sailboats. They also brought to the attention of the jury the fact that other designs incorporate different features which have different electrical properties from those incorporated in the Hobie Cat. In sum, they attempted to demonstrate to the jury that a safer, feasible alternative design existed and that if the alternative design had been used in constructing the Hobie Cat, the accident would not have happened.

Coast and Coleman moved for a directed verdict arguing that Ogg and Henrici had failed to prove the existence of a safer, feasible alternative design. Their motion was denied. On appeal, they argue that it was error for the trial judge to refuse to direct a verdict in their favor. They maintained that because the plaintiffs raised the issue of whether a safer, feasible alternative design existed, the plaintiffs then had the burden of proving that such a design actually did exist. Coast and Coleman argue that the plaintiffs failed to meet that burden.

We agree that Ogg and Henrici failed to prove the existence of a safer, feasible alternative design. And although we are somewhat inclined to agree with Coast and Coleman's position that such failure necessitates a directed verdict in their favor, *that is not the law* as stated by our supreme court. Consequently, we must resolve this issue in Ogg and Henrici's favor.

■ Our supreme court has repeatedly stated that in order to prove a *prima facie* products liability case, the plaintiff must prove three elements: (1) that the condition of the product was a proximate cause of the plaintiff's injury; (2) that the condition was unreasonably dangerous; and (3) that the condition existed at the time the product left the defendant's control. (See *Coney; Palmer v. Avco Distributing Corp.* (1980), 82 Ill. 2d 211, 412 N.E.2d 959; *Bejda v. SGL Industries, Inc.* (1980), 82 Ill. 2d 322, 412 N.E.2d 464.) Our supreme court has *never* included the existence of a feasible alternative design as one of the elements a plaintiff *must* prove in order to succeed in a products liability case. In fact, in *Palmer*, the supreme court ruled that evidence of an alternative design is admissible as proof of one of the required elements.

■■■ The supreme court in *Palmer* stated that the dangerousness of a product is usually proved in one or both of two ways: either by introducing evidence that when the product was used in the customary manner, injury resulted; or by introducing evidence of the existence of a safer, feasible alternative design. Thus, the existence of an alternative design becomes not an element of proof but instead merely one method of proving one of the elements of proof—that the product was unreasonably dangerous. Consequently, the trial judge in the present case did not err when he refused to direct a verdict in Coast and Coleman's favor.

Nevertheless, it appears patently unfair to us to allow a plaintiff to cloud the jurors' minds with the idea that a safer, feasible alternative design exists without also requiring him to prove that such a design does actually exist. Under the law as it now stands, a plaintiff by simply raising the issue of an alternative design can throw the practical burden on the defendant to disprove its existence. If the defendant cannot or chooses not to meet that burden, the jurors go to the jury room believing that an alternative design exists whether or not it actually does.

It appears to us that a fairer rule would be to require a plaintiff who raises the issue of whether an alternative design exists to carry the burden of proving that it does. If the plaintiff chooses not to raise the issue, then he need only prove the three elements outlined above. If, however, he chooses to raise the issue, then he must prove a fourth element—that a safer, feasible alternative design does exist. But until our supreme court addresses this problem, we can do no more than flag this problem and voice our concern.

### 2. POST-ACCIDENT OCCURRENCES

■■■ During the trial, the plaintiffs entered into evidence several documents concerning activities and occurrences which took place after the accident. Coast and Coleman argue that the plaintiffs failed to connect these exhibits to any material issue in the case. We disagree.

By entering the exhibits, the plaintiffs were attempting to show the existence of a safer, feasible alternative design. Although it is uncertain how far a few of these documents actually went toward demonstrating the existence of such a design, they were all admissible for that purpose. See *Kerns v. Engelke* (1979), 76 Ill. 2d 154, 390 N.E.2d 859.

### 3. THE FIBERGLASS TILLER CROSSBAR

In another effort to demonstrate that an alternative design ex-

isted, Ogg introduced a fiberglass tiller crossbar into evidence. Coast and Coleman argue that it was error for the trial judge to allow Ogg to introduce the exhibit. Once again, we disagree.

■ Courts have long favored the use of demonstrative evidence to help the jury to better understand the issues in a case. (*Hubbard v. McDonough Power Equipment, Inc.* (1980), 83 Ill. App. 3d 272, 404 N.E.2d 311.) The overriding considerations in admitting demonstrative evidence are relevancy and fairness. (*Lake County Forest Preserve District v. Vernon Hills Development Corp.* (1980), 85 Ill. App. 3d 241, 406 N.E.2d 611, *aff'd* (1982), 92 Ill. 2d 72, 440 N.E.2d 848.) The admissibility of demonstrative evidence is a matter within the trial judge's discretion and his ruling will not be disturbed absent a clear showing that he abused that discretion. *Becker v. Aquaslide 'N' Dive Corp.* (1975), 35 Ill. App. 3d 479, 341 N.E.2d 369.

■ The admission of the crossbar was relevant to the question of whether a safer, feasible alternative design existed. And we can find nothing unfair about the manner in which it was introduced. No error.

### E. MISCELLANEOUS EVIDENCE QUESTIONS

#### 1. PRIOR CALIFORNIA CASE

■ During the trial, Ogg elicited testimony from a Coast employee concerning a prior case in California involving a Hobie Cat electrocution accident. On appeal, Coast and Coleman argue that this testimony was immaterial and that it was introduced in a manner that was unfairly prejudicial. We disagree.

The testimony was relevant to show Coast and Coleman's prior knowledge of the dangerous condition of the Hobie Cat. And we can find nothing in the manner in which it was elicited which unfairly prejudiced either Coast or Coleman. Furthermore, Coast and Coleman waived this issue by failing to make a proper and timely objection at trial. The only objection their counsel made while the testimony was being elicited was that it was hearsay. Nothing was mentioned about relevance or unfair prejudice. *Ergo*, these objections cannot now be raised here. No error.

#### 2. IMPEACHMENT OF WITNESSES

In an attempt to impeach several of Coast and Coleman's witnesses, Ogg's counsel read into the record excerpts from those witnesses' discovery depositions. On appeal, Coast and Coleman argue that the material was not impeaching and that the trial judge erred in

allowing it to be read into evidence.

■■ The test for determining whether a prior statement is sufficiently inconsistent to be used for impeachment purposes is whether the inconsistency is great enough to contravene the witness' direct testimony on a material matter. (*Grabner v. American Airlines, Inc.* (1980), 81 Ill. App. 3d 894, 401 N.E.2d 1196; *Goldstein v. Hertz Corp.* (1973), 16 Ill. App. 3d 89, 305 N.E.2d 617.) Matters of impeachment are within the discretion of the trial court. *Law v. Central Illinois Public Service Co.* (1980), 86 Ill. App. 3d 701, 408 N.E.2d 74.

In the present case, Mr. Campbell, an employee of Coast, testified that there was an ongoing project between 1976 and the date of the accident to find a design change to eliminate the electrocution hazard in the Hobie Cat. Ogg's counsel read a statement by Campbell from his deposition that there was no such ongoing project. Ogg's counsel asked Campbell if he had any documentation of certain work performed in the attempt to find a safer alternative design. Campbell testified that such documentation did exist. Ogg's counsel then read an excerpt from Campbell's deposition where he stated that he did not have any such documentation. Campbell also testified that certain other records on the electrocution problem did exist but that he did not know where they were filed. Ogg's counsel read a portion of Campbell's deposition where Campbell stated that he did not know of any such records.

Mr. Lee, another employee of Coast, testified that he did not know whether there was an active engineering project at Coast in the years 1976 and 1977 which was directed at solving the electrocution problem. Ogg's counsel then read an excerpt from Lee's deposition where he stated that there was no such project at Coast. Lee also testified that he never ordered any material for electrical tests on the tiller crossbar. Ogg's counsel read an excerpt from the same deposition where Lee stated that a tiller crossbar had been ordered for testing purposes.

■■ In sum, all of the witnesses' prior statements were sufficiently inconsistent with their direct testimony to be used for impeachment purposes. The trial judge did not err by allowing Ogg's counsel to read them into evidence.

### 3. PARTY ADMISSIONS

■■ Hobart Alter, the designer of the Hobie Cat and one of the original owners of Coast, testified at the trial. After he had been excused as a witness, Ogg's counsel read into the record, as purported admissions, excerpts from Alter's deposition. On appeal, Coast and

Coleman argue that the trial judge erred by allowing the excerpts to be read into evidence. We disagree.

Alter presently is an employee of Coast. His statements pertain to his duties before and after Coleman acquired Coast. Those statements were relevant to the issue of whether Coleman was aware of the electrocution problem with the Hobie Cat before and/or after it bought Coast. Also, it was not error to admit the statements from his deposition into evidence after he had been excused as a witness. (See *Security Savings & Loan Association v. Commissioner of Savings & Loan Associations* (1979), 77 Ill. App. 3d 606, 396 N.E.2d 320; *Rose v. City of Chicago* (1942), 317 Ill. App. 1, 45 N.E.2d 717.) No error.

### 4. SUFFICIENCY OF MEDICAL TESTIMONY

■■ Next, Coast and Coleman argue that Henrici's judgment against them must be reversed because he failed to prove a causal link between the accident and his subsequent bowel surgery. Again, we disagree.

Henrici presented three medical experts who testified that the stress of the accident was great enough to cause his bowel condition to worsen to the point where surgery was necessary. Their testimony was sufficient to allow the jury to find that a causal link between the accident and the surgery existed. See *Dixon v. Industrial Com.* (1975), 60 Ill. 2d 126, 324 N.E.2d 393; *National Castings Division of Midland-Ross Corp. v. Industrial Com.* (1973), 55 Ill. 2d 198, 302 N.E.2d 330.

### F. DAMAGES

On appeal, Coast and Coleman have raised three issues concerning the damages the jury awarded Ogg. *First*, they argue that the testimony concerning Welch's future earnings should not have been allowed into evidence because it was too speculative. *Secondly*, they maintain that it was error for the trial judge to instruct the jury that in assessing damages it could consider the society Welch provided her parents. *Thirdly*, they argue that it was error for the trial judge to instruct the jury that it could consider the pain and suffering Welch experienced before she died.

During oral arguments in this court, however, Coast and Coleman's counsel informed us that it is their position that if we are unwilling to remand this cause for a new trial on both the question of liability and the question of damages, they do not want a new trial on the damages question alone. Therefore, because these three issues go *only* to the question of damages and because we are not remanding

for a new trial on the liability question, it is not necessary that we address them.

### III. Ogg And Henrici's Cross-appeal

A. DISCOVERY

On cross-appeal, both Ogg and Henrici argue that Coast and Coleman violated the discovery rules by purposefully withholding several documents. Ogg and Henrici maintain that these documents would have convinced the jury that Coast and Coleman acted wilfully and wantonly. They argue that these documents were not discovered by them until after the trial was over and that after their discovery, the trial judge should have granted them a new trial on their punitive damages claims.

■■ We note initially that Ogg brought his claim for punitive damages under the Survival Act. (Ill. Rev. Stat. 1981, ch. 110½, par. 27—6.) Our supreme court recently held in *Froud v. Celotex Corp.* (1983), 98 Ill. 2d 324, that under its earlier decision in *Mattyasovszky v. West Towns Bus Co.* (1975), 61 Ill. 2d 31, 330 N.E.2d 509, a common law claim for punitive damages cannot be brought pursuant to the Survival Act. In *Froud,* the court refused to overrule its position in *Mattyasovszky* that common law claims for punitive damages do not survive the death of the decedent. Accordingly, we will not grant Ogg's request for a new trial on his claim for punitive damages.

■■ ■ In order for newly discovered evidence to warrant the granting of a new trial, it must be of such a conclusive character that it will likely change the result if a new trial is granted. (*Kaster v. Wildermuth* (1969), 108 Ill. App. 2d 288, 247 N.E.2d 431; *Powers v. Browning* (1954), 2 Ill. App. 2d 479, 119 N.E.2d 795.) The decision whether to grant or deny a motion for a new trial rests within the discretion of the trial judge. (*Estate of Whittington v. Emdeko National Housewares, Inc.* (1981), 96 Ill. App. 3d 1007, 422 N.E.2d 26.) And his ruling will not be reversed unless it is clear that he has abused his discretion. *Lode v. Mercanio* (1979), 77 Ill. App. 3d 150, 395 N.E.2d 1014.

■■ It is not apparent from the record that the documents in question were purposefully withheld in violation of discovery rules. Furthermore, after a careful review of the documents, we are not convinced that their introduction at a new trial would likely change the result. Consequently, we find that the trial judge did not abuse his discretion when he refused to grant Henrici a new trial.

B. MANIFEST WEIGHT OF THE EVIDENCE

■■■ Next, Ogg and Henrici argue that the jury's finding that Coast and Coleman's conduct was not wilful and wanton is against the manifest weight of the evidence. After a thorough consideration of the entire record, we find that the jury's decision that Coast and Coleman's conduct was not wilful and wanton is not against the manifest weight of the evidence.

A jury's verdict should not be disturbed unless that verdict is contrary to the manifest weight of the evidence. (*Guthrie v. Van Hyfte* (1966), 36 Ill. 2d 252, 222 N.E.2d 492; *Martin v. Kralis Poultry Co.* (1973), 12 Ill. App. 3d 453, 297 N.E.2d 610.) And a jury's verdict is against the manifest weight of the evidence only if it is wholly unwarranted by the evidence or clearly the result of passion or prejudice. *Looft v. Missouri Pacific R.R. Co.* (1982), 104 Ill. App. 3d 152, 432 N.E.2d 1152; *Davelis v. Central Engineering Co.* (1980), 86 Ill. App. 3d 593, 408 N.E.2d 218.

In the present case, the jury heard a great deal of testimony which tended to demonstrate that Coast and Coleman persisted in manufacturing and marketing the Hobie Cat long after they learned of the electrocution hazard. The record shows that Coast learned about the hazard soon after it began marketing the sailboat and that Coleman had known about the hazard at least since 1976 when it purchased Coast. The record also reflects that Coast and Coleman chose to issue warnings about the hazard instead of changing the design to eliminate the hazard.

The jury, however, also heard much testimony which tended to show that it was neither safer nor feasible to use all nonmetallic parts in the Hobie Cat. The jurors heard testimony that it was impossible to design a catamaran without using metallic parts that was strong enough to withstand rough waves without breaking up. There was also testimony that it was not possible to design the sailboat so that persons in the water and persons on the boat would both be safe from electrocution.

It is clear, therefore, that the jury's verdict is supported by the record and that it was not the result of passion or prejudice.

IV. CONCLUSION

Since we have found no reversible error, we affirm.

Affirmed.

TRAPP and WEBBER, JJ., concur.